## Case No. 14,087.

### TOMLINSON v. HEWETT.

[2 Sawy. 278.][1]

District Court, D. California. Nov., 1872.

SEAMEN—RIGHT TO BE CURED—DAMAGES FOR PUTTING ASHORE.

A sick seaman is entitled to be cared for and cured at the expense of the ship, and the fact that his disease is malignant and infectious, will afford no justification or excuse to the master for setting him ashore, without any provision for his care, his subsistence, or his proper medication.

[Cited in Grimes v. Eddy, 126 Mo. 168, 28 S. W. 760; Scarff v. Metcalf, 107 N. Y. 216, 13 N. E. 796.]

[This was a bill by Thomas Tomlinson against Charles Hewett to recover damages for the sufferings occasioned by breach of duty on the part of the respondent.]

D. T. Sullivan, for libellant.

Hambleton & Gordon, for respondent.

HOFFMAN, District Judge. As to the material facts in this case, there is no substantial controversy.

On the second of October, 1868, the libellant, Thomas Tomlinson, a seaman on board the steamship Pacific, was found to be ill of the small-pox. The steamer was then at Gardner City, on the Umpqua river, where she had arrived on the preceding day.

The captain, on learning the nature of the libellant's malady, informed him that it was impossible to afford him proper treatment on board the ship, but that he had secured the services of a physician, and provided for the necessary attendance upon the libellant, at Scottsburg (a town about fifteen or twenty miles further up the river), and that he had a boat in readiness to take him there. The libellant replied that he was willing to go if proper provision had been made for taking care of him; but, if not, that he would remain on board the ship. He was assured by the master, as he says, that all necessary arrangements had been made. He thereupon went into the boat, and was rowed up to Scottsburg, by a man hired for the purpose by the respondent.

On arriving at Scottsburg, the libellant inquired of the man who had him in charge, where the doctor was, and was told that there was none in the place, or nearer to it than at Oakland, distant some sixty miles. He then proceeded to the store, which seems to have

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

the principal building of the town, and finding the purser of the steamer, asked him where the physician was to whom the captain had sent him. The purser, and also the store-keeper, informed him that there was none in the town.

The appearance of the libellant, with the eruption of small-pox unmistakably visible on his face, naturally created excitement and alarm in the village. He was without means, except $17.50, the balance due of his wages, which the respondent had given him on leaving the ship. He was furnished with no letter of recommendation or credit to any one. Even, therefore, if the inhabitants of the town would have permitted him to remain, and if he had been willing to dispense with the services of a physician, he was without the means of obtaining lodgings or employing a nurse or other person to attend him during his sickness. He was therefore obliged to return to the vessel, which he reached about nine o'clock in the night. On coming alongside, he informed the respondent that he had been driven away from Scottsburg; that there was no physician in the place, and he asked him why he had said that he had provided one. To this the master replied that he thought there was one at Scottsburg. The master admitted on the stand, that he had never been at Scottsburg, that he had made no arrangements whatever for the reception and care of the libellant; that he had given no instructions to the purser, nor communicated with any one on the subject, but had sent the libellant to Scottsburg on the strength of information which he obtained at Gardner City, that there was a drug store and a doctor in the town.

The libellant and the boatman also informed the respondent that the principal inhabitants at Scottsburg had recommended him to go to Winchester, about six miles further down the river, where a man resided from whom a horse could be procured to go to Coos Bay.

The libellant testifies, that on being asked by the boatman whether he should take him to Winchester, the master replied, with much irritation and even profanity, that he might take him and put him ashore anywhere. This the master denies; but he admits that he peremptorily and absolutely refused the libellant's urgent request to be received on board and carried to Coos Bay in the ship.

Denied an asylum on board the ship, the libellant had no alternative but to proceed to Winchester and endeavor to reach Coos Bay by land. He arrived at Winchester late at night, and found there a young man who, probably ignorant of the nature of his disease, permitted him to sleep in the house, and agreed to furnish him with a horse to proceed to Coos Bay in the morning.

Not the least melancholy incident in this painful case is the fact, that two weeks afterward the young man died of small-pox, contracted from the libellant. At an early hour the next (Sunday) morning, the libellant started on horseback and alone for Coos Bay. He was from eight to ten hours on the road, and arrived toward night at the river, across which communication is had with the town by a ferry. He was here directed by a person whom he met on the road to go to the flag-staff and raise the flag as a signal for the ferry-boat.

In attempting to reach the flag-staff, he fell fainting and exhausted from his horse. The man shortly afterwards returned, and, keeping at a safe distance, informed the libellant that he would cross the river in his boat, and inform the authorities of his condition. From this time (Sunday night) until Tuesday morning, the libellant lay upon the beach blind, unable to move, and unapproached by any human being from whom he might obtain even a cup of water to allay his thirst. He describes his sufferings during these thirty-six or forty hours as intense.

On Tuesday morning he was visited by Dr. Bryant, who had been employed for the purpose by the authorities. For some reason, not disclosed by the evidence, he was not taken to any house, but lay on the beach on blankets for about three weeks. Some sticks were put in the ground, and planks were set up against them to protect him, as he says, from the coyotes. They probably, also, served as a partial shelter from the wind. He appears, however, to have been attended with assiduity and humanity by the doctor, and he does not, in his narrative on the stand, seem to consider that the suffering incidental to the malignant disease under which he was laboring, was greatly enhanced by the exposure to which he was subjected.

At the expiration of three weeks, he was removed up the river to a logging station, where he remained five weeks, and until his cure was effected. He subsequently obtained a passage in a schooner, and came to this city.

It was suggested at the hearing that the libellant had probably contracted the disease before coming on board said vessel. The inquiry is, in my judgment, immaterial, but the fact is, I think, otherwise.

The libellant went on board the ship at this port, on Friday, September 18. On the twenty-sixth, the vessel reached Crescent City, where two men found to be sick with the small-pox were set on shore. One of these men was rowed ashore by the libellant, and had up to that time occupied the berth beneath his, in the forecastle. The libellant was obliged to cease doing duty on the twenty-ninth, and it was not until the second October, that the master became satisfied that his disease was the small-pox. Under these circumstances, it seems far more probable that the libellant contracted the disease from his comrades, in the forecastle, than that he had the seeds of it in his system, when he first joined the ship, some fourteen days previously to the time when it unmistakably announced itself. But, as before observed, the inquiry is immaterial. The libellant fell sick while in

the service of the ship, of a disease not caused by his own vices. He was entitled to be taken care of and cured at the expense of the ship.

The important question is thus presented—does the fact that the disease of the seaman is malignant, loathsome, and infectious, and that his longer continuance on board exposes the remainder of the ship's company to the danger of contracting it, justify the master in setting him ashore without any provision whatever for his care, his subsistence, or his proper medication, or nursing?

That such was the course pursued in this case by the respondent, is, 1 think, undeniable.

It has already been stated, that when the libellant was sent to Scottsburg, no arrangements whatever had been made by the master for his reception. He was aware that, without such arrangements, which could only be made by the personal influence of the master, and by the offer of a considerable sum of money, a poor seaman, afflicted with the small-pox, would not probably be allowed to remain in a small country town. He had already landed two men at Crescent City, who had been sent back to the ship, and it was only by going ashore himself and effecting an arrangement with a physician for their lodging and care during their illness, that he was permitted to leave them behind. He says that he was told there was a physician at Scottsburg, but he did not go there himself, or send any one to ascertain the fact; and his inquiries at Gardner City could not have been extensive, or he would have discovered what proved to be the true state of the case.

But, at all events, he knew, on the libellant's return, that he could find no physician there, and that he had been driven from the town. The refusal, therefore, with this knowledge, to receive the libellant on board, and his telling the boatman to carry him to Winchester, or anywhere else, puts the respondent in the same position as if he had then for the first time expelled the libellant from the ship, and set him ashore with $17.50 in his pocket, and under the full power of the terrible disease under which he was suffering, to find his way as best he might for a distance of twenty miles overland to a strange place, and there take his chances of succor and an asylum.

Undoubtedly the situation of the respondent was painful. The crew were greatly alarmed, and if, with due regard to the claims of humanity and the rights of the seaman, he could have been removed from the ship, it was desirable to do so.

The vessel was to sail the next morning. Coos Bay was distant about twenty-six miles. In a few hours the libellant could have been transported thither, and arrangements for taking care of him could have been effected, as at Crescent City.

It would not seem very difficult, during the brief period he would in that case have been on board, to have isolated him from the rest of the ship's company, and thus have reduced to a minimum the chances of the further propagation of the disease. The eruption of small-pox had appeared on the libellant before he left the ship. To those who had already escaped the infection, the additional risk occasioned by a few hours' longer exposure would not probably have been great, and certainly no humane person ought to have hesitated between accepting that risk or adopting the only other alternative, that of sending the seaman ashore to propagate the disease among unsuspecting inhabitants, and at a place twenty miles distant from all possibility of assistance or relief.

I think that the libellant has clearly established his right to recover damages for the sufferings occasioned by the respondent's breach of duty. That much of what he was obliged to endure was incidental to an attack of confluent small-pox of a malignant type, and must necessarily have undergone under the most favorable conditions, is apparent. But he has a right to recover for the additional and unnecessary pain of his trip to Scottsburg and back, his ride on horseback to Coos Bay, and the terrible agony he must have suffered during the time that he lay helpless and tortured by thirst on the beach.

With the exception of $5 paid to the boatman, it does not appear that the respondent or the vessel had contributed any thing towards the expenses of the seaman's cure. The doctor's services were paid for by the county, and the libellant himself only received the wages earned up to the moment of his leaving the vessel.

The vigor with which courts of admiralty maintain and enforce not only the right of the seaman to be cured at the ship's expense, but also the duty of the master to omit no reasonable exertions to remedy or mitigate the effects of any accident that may happen to him, is forcibly illustrated in the case of Brown v. Overton [Case No. 2,024]. In that case, Judge Sprague says:

"A seaman disabled in the service of a ship is entitled to be cured at the expense of the ship. To this his right is as perfect as to food and wages. It is incumbent on the master to furnish means of cure, and to use all reasonable exertions for that purpose. Scarcely a case can be presented where this obligation applies with greater force than the present. This seaman, at the command of his officer, had exposed his life and his limbs for the preservation of the ship. He was thrown from the yard-arm, and both legs were badly fractured. There was no surgical skill on board, and the increasing motion of the ship, and the accidents and discomforts to which he was necessarily exposed, were unfavorable to his cure. The master intended to go within sight of St.

Helena, and if he had shaped his course to go into port, he might, with only a few hours' detention, have consulted the American consul, obtained surgical aid and advice, and ascertained how far it was necessary, or would be useful, for the libellant to be left on shore. The reason assigned by the master since his return for not having left this seaman at St. Helena is that it would have occasioned additional expense. This presents not the least extenuation. It is merely saying that if he had performed his duty, the owners would have been subjected to a burden which the law imposes. The master ought to have gone into St. Helena, to have given to the seaman the means of cure which that place afforded; and for this neglect the libellant is entitled to recover such damages as he has sustained."

In this case, the seaman was permanently crippled and deformed by the injury he had sustained. But it was uncertain under the evidence what degree of surgical skill could have been obtained at St. Helena, and whether when the vessel arrived at that place it was not too late to remedy the distortion produced by the fracture. The court was, therefore, unable to give to the libellant the same measure of damages as if it were certain that the whole permanent injury arose from the master's default. $600 and costs were awarded.

But if, in that case, it was the master's duty to deviate from his voyage, and go into a foreign port in order to afford the seaman the chance merely of surgical aid, by how much more was it the duty of the respondent in the case at bar to touch at Coos Bay or Crescent City, ports which lay in his direct route, and are the usual stopping places of the steamer, from the nearest of which he was distant only twenty-six miles, and at either of which he knew that medical aid and care could be procured for the seaman. Instead of doing so, he induces him to leave the vessel under false assurances that he had made provision for taking care of him, without credit, and with but a small sum of money, and he sends him to a place fifteen or twenty miles distant, where, if there had been a physician and a drug store, the libellant would have been without the means of availing himself of their aid.

The circumstances of the case justify the suspicion that the design of the master was to get rid of the libellant at any risk to him, or to the people on whose charity he attempted to cast him, and that he hoped the vessel would have sailed before the libellant could rejoin her.

When he did return to the ship, the respondent peremptorily refused to receive him on board, and sends him to be landed almost at dead of night on a beach, to crawl from thence, over rocks and drift-wood, to a solitary house twenty miles distant from any possible medical aid or attendance; and to the occupant of which he communicates with

fatal effect the infection of his disease. That he survived the fatigue of his ride to Coos Bay and his subsequent exposure on the bank of the river, is a fortunate and extraordinary circumstance which the respondent, when he sent him from the ship, had no right to anticipate.

It has appeared to me difficult to imagine a stronger case of either disregard by a master of his duty to a sick seaman, of the rights of the people on shore, whom he exposed to the infection of a malignant disease, and of the dictates of common humanity.

I shall decree damages in the sum of $2,500. The amount is large, but not as great, I am persuaded, as a jury would probably have awarded. And I have a right to presume that out of the damages, when recovered, the libellant will satisfy the just claims of those who afforded him the succor and care which the master refused.