## SINGURD LANGAAS *v.* THE BARKENTINE "JAMES TUFT," her apparel, tackle, etc.

### DECIDED:  JULY 2, 1903.

1. In an action in admiralty *in rem* for damages for injuries sustained by a seaman on board the barkentine "James Tuft," where it appears that said seaman was thrown down on the deck by heavy seas and caught under a spar lashed amidships, which spar rose and fell upon the seaman, breaking his thigh bone; it being claimed by him that the injury was due to the improper placing of said spar on said ship and in the insecure lashing of the same, and where it was shown to be customary to place such spars on board sailing vessels to be used in case of emergencies; *Held,* that while there was some doubt as to whether this spar was properly placed or securely lashed to the deck, yet in the absence of any allegation or proof of either incompetency among the officers, or of neglect in providing the usual number of men required to man the vessel, or of unseaworthiness in any particular, the accident was the result of the perils of navigation, and resulted from the risks incident to libellant's employment, for which the vessel is not liable.

2. The fact that the master of the vessel was a part owner therein, held not material in the absence of any evidence of such negligence as would entitle the libellant to damages for the injury primarily done him.

3. The maritime law is sensitive as to the rights of seamen and rigorous in providing for their protection. When injured in the service of the ship, or disabled by illness while in such service, they are entitled to be cared for, and cured if possible, at the expense of the vessel; and where that duty is not performed, and a seaman suf-

fers from the neglect, the ship is liable in consequential damages for the suffering and pain caused by such failure.

4. Where on a voyage from Newcastle, in the Colony of Australia, to Honolulu, in the Territory of Hawaii, a seaman on board the "James Tuft" was seriously injured by having his thigh broken, and on the twelfth day after such accident the vessel was within sixty miles of Papeete, on the Island of Tahiti, a well-known and settled French colony, where it was reasonable to suppose medical and surgical aid were obtainable for the injured man, but the Captain of the vessel failed to put into such port, proceeding instead on his voyage to Honolulu, which he reached nearly three weeks thereafter, and where he placed the injured man in the U. S. Marine Division of the Queen's Hospital, the seaman being confined in said hospital since that time for a period of nine and one-half months, undergoing two severe surgical operations on the injured leg, and being shown at the trial to be a cripple unable to walk without the aid of a cane, which condition is due, according to the testimony of a leading physician, to the bone being allowed to go without proper surgical treatment;

*Held,* that the master of the vessel was guilty of gross negligence in failing to take libellant to the nearest port, which in this instance was Papeete, on the Island of Tahiti, for surgical aid after he had been wounded in the service of the ship, for which negligence libellant has an additional and different cause of action against the vessel, which is liable in consequential damages.

5. Where an injured seaman was left at a hospital in the city of Honolulu, the vessel on which he was injured proceeding on her voyage and not returning to the port of Honolulu until nine and a half months thereafter, the seaman during all of that time being confined in the hospital undergoing treatment for his injuries, *Held,* that an action instituted by him immediately upon the return of said vessel was in sufficient time and no laches is shown.

IN ADMIRALTY. LIBEL *in rem* FOR DAMAGES FOR PERSONAL INJURIES.

*T. McCants Stewart,* proctor for libellant.
*Robertson & Wilder,* proctors for respondent.

ESTEE, J. This is a libel in admiralty *in rem* filed on behalf of a seaman on board the barkentine "James Tuft", for damages in the sum of ten thousand dollars for personal injuries sustained on board said barkentine, through the alleged negligence of the master thereof. The complaint also asks for general relief. The facts appear to be these: On the 16th

day of July, 1902, the libellant shipped on board the said bark-
entine for a voyage from Newcastle in the Colony of Australia
to Honolulu in the Territory of Hawaii, leaving Newcastle about
the 19th day of July, of said year; said vessel was in charge of
and managed and controlled by one August Friedberg, acting
as master thereof, and who was a part owner in said vessel to
the extent of a thirty-second interest therein.

Before leaving Newcastle, a yard spar and also one other
spar were placed aboard the vessel and lashed amidships. After-
wards and before the accident occurred one of these spars was
moved forward while the other remained in the original posi-
tion. Some eighteen days out from Newcastle, the libellant
was ordered to "tighten up the weather braces of the mainyard
and to make square the yard." He was standing near the rail
preparatory to doing this, and was working at the braces, when
a heavy sea washed over the rail, threw him down on the deck
and this yard spar lifted up by the heavy sea came down on the
foot of libellant, when another sea coming, he was thrown fur-
ther under the spar which came down heavily on his knee, and
finally falling on the thigh of the libellant broke it, causing in
the technical language of Dr. Cooper, a medical expert intro-
duced by libellant, "a fracture of the upper third of the femur
of the right leg."

Libellant was pulled out from under the spar and taken to
the forecastle first, where rude splints were made ready and his
limb set by the Captain with what little knowledge he had. He
was afterwards removed to the cabin of the second mate and a
box was made in which to place the limb so that in the words
of the libellant "it would not roll." There libellant remained
until the vessel reached Honolulu some thirty two days later
when he was taken to the United States Marine Division of the
Queen's Hospital where he has continued to remain for the
period of nine months and a half, not yet being discharged from
said hospital. During this period of time, he has undergone two
severe surgical operations, after one of which he remained in
bed six weeks, and after the second operation three months,
both being necessitated by the condition of the thigh, as a result

of the injury. The Captain of the vessel after paying the libellant what he deemed the balance of wages due him for the voyage and placing him in this hospital, left Honolulu and sailed for Puget Sound and did not return to Honolulu until at or about the time of the commencement of these proceedings, having been on one other voyage since the accident and having no one of the original crew with him excepting his present first mate. The libellant as a result of the accident is a cripple walking with great difficulty and even then only with the aid of a cane. The right leg is deformed and fully three inches shorter than the other one.

When the accident occurred, the vessel was 1700 miles from Newcastle, 770 miles from Auckland and 1500 miles from the Island of Tahiti. On the twelfth day out after the accident occurred, the vessel was within sixty miles of Tahiti and enjoying fine weather. They were at this time nearly three weeks' sailing distance away from Honolulu, as it took nineteen days to reach this port.

It is not claimed that libellant contributed at all to his injury. Under the pleadings and proof in this case, two questions are presented. First, as to whether the injury to libellant was due in the first instance to the negligence of the captain of the vessel by the improper placing and insecure lashing of the spars, a part of the apparel of the vessel, for which negligence the owner is liable; and second, as to the neglect of the captain of the vessel after the injury occurred to libellant, in not putting in to the nearest port on the Island of Tahiti for surgical aid for him.

Among the duties which the owner of a vessel owes to its crew, are to see that the vessel is seaworthy in all particulars; that it is provided with all the necessary appliances for the safety of the ship and of the men; that the ship is properly manned and provided with proper food supplies; and further that in case of sickness or injury of any member of the crew, that he shall be given proper care and medical attendance. For a failure in the performance of any one of these duties, the owner of the ship is liable.

I do not think under the evidence produced in this case, that there has been shown any neglect of any of these positive duties on the part of the owner of the barkentine, except the last, that requiring proper care and medical attendance. There is no allegation or proof of any incompetency among the officers; no allegation or proof of any neglect in providing the usual number of men required to man the vessel, and none of any unseaworthiness in any particular. It is true these spars were placed aboard the vessel at Newcastle, but it appears from the weight of the evidence that it is usual and customary to place spars of the character described on board sailing vessels to be used in case of emergencies. There is some doubt in my mind as to whether these spars were properly fastened or securely lashed to the decks. The libellant testified that on the day before the accident occurred one of these spars had been moved forward, and that by such removal the center lashings of the remaining spar were taken off, which spar was then only fastened at either end by lashings secured to ring bolts attached to the main and after hatches, leaving the center loose. This testimony is contradicted by that of the captain and the present first officer of the ship, both of whom claim that the fact that the spar raised as far as the lashings would allow it was due to the heavy seas and the slackening of the rope occasioned by the constant wetting. It is common knowledge that water will cause rope to stretch. The weather had been bad and on the day of the accident was very stormy with high seas, which swept the deck. The ship had 1800 tons of coal on board while its measurement was only 1000 tons. The vessel was therefore loaded to her full capacity. I do not feel at all certain as to there being any negligence on the part of the captain or other officers of the ship in respect to causing the injury. I am inclined to believe that the accident was the result of the perils of navigation, and resulted from one of the risks incident to libellant's employment for which the vessel is not liable.

In the case of the *City of Alexandria*, 17 Fed. 390, in an action for damages for injuries sustained by a seaman who, in endeavoring to obey an order, fell down an open hatchway,

and who claimed his injuries were due to the negligence of the ship's officers, the Court held:

"Whatever negligence there was,—whether in leaving the hatches uncovered or in not notifying the libellant as he went down,—was negligence on the part of those on board the ship and in no way traceable to the owners themselves. It was neglect of the officers or men aboard in the performance of their ordinary duties; a neglect against which the owners could not possibly guard...... The navigation of a ship from one port to another constitutes one common undertaking or employment, for which all the ship's company in their several stations are alike employed. Each is in some way essential to the other in furtherance of the common object, *viz*: the prosecution of the voyage. Each one, therefore, upon the principles laid down in the common law courts, takes the risk of any negligence in the performance of his duties by any of his associates in the common employment."

*Olson v. Oregon Coal & Navigation Co.*, 96 Fed. 109; *Id.* 104 Fed. C. C. A. 292.

In this latter case, both in the District Court and upon appeal to the Circuit Court of Appeals, it was held, "That while it is true the master of a ship is a servant of a higher grade than that of a seaman, and represents the owner in respect to the personal duties and obligations which the latter owes to the seaman, still in all matters pertaining to the navigation of the ship, the master and the seaman are fellow servants engaged in one common employment and each assumes the risk of the other's negligence in the discharge of the duties incident to such common employment."

*Gabrielson v. Waydell*, 135 N. Y. 1; *Scarf v. Metcalf*, 107 N. Y. 211; *Loughlan v. State*, 105 N. Y. 159; *City of Norwalk*, 55 Fed. 98.

It may be that some qualification of this rule should be made, where, as in this case, the master is a part owner of the vessel, but I do not deem it necessary to discuss that point, as it is not in any view decisive of the case, believing as I do that there was

no such negligence shown as would entitle the libellant to damages for the injury primarily done him.

But whatever I may hold as to the failure of libellant to sustain his claim for damages against the ship by reason of the negligence of the ship's officers in causing the injury, which was not made clear, there is no doubt whatever but what he is entitled to damages for the gross negligence of the captain in failing to put into the nearest port at the time of the injury or as soon thereafter as it was possible to do so, to get proper surgical aid for this man. This was the positive duty of the captain of the vessel, irrespective of any sacrifice of time or risk to cargo, "it was a burden which the law imposes." *Brown v. Overton*, 1 Sprague 462, Fed Case No. 2024; *The Iroquois*, 113 Fed. 964; *Whitney v. Olson*, 108 Fed. 292; *The Troy*, 121 Fed 901.

The maritime law is sensitive as to the rights of seamen and rigorous in providing for their protection. When injured in the service of the ship, or disabled by illness while in such service, they are entitled to be cared for and cured if possible at the expense of the vessel; and where that duty is not performed and the seaman suffers from the neglect, the ship is liable in damages for the suffering and pain caused by such failure. *Couch v. Steel*, 77 Eng. Com. L. 402; *Brown v. Overton*, 1 Sprague, 462; Fed Cases No. 2024; *Tomlinson v. Hewett*, 2 Saw. 278; *Whitney v. Olson*, 108 Fed. 292; *The Troop*, 118 Fed. 769.

But what are the uncontradicted facts in this case? The captain admits the injury; he knew the man's thigh was broken; he admits that he attempted to set it. He must have known of the dangerous probabilities that might ensue through lack of proper surgical attendance therefor. Even if the thigh had been set properly it would be almost impossible for the bones to knit on ship board owing to the constant movement of the vessel. The captain testified that at the time of the accident, "the ship was in latitude 44-55 south; longitude 168-30 w. which would be from Auckland approximately 770 miles." That they were some 1500 miles from Tahiti, and "1700 miles from Newcastle." It may be true that it was too rough and stormy, as he stated, to go back to Auckland or to Newcastle, but the Island of Tahiti

was directly in the line of this vessel's voyage, and on the twelfth
day after the injury, the vessel was, as testified to by Captain
Friedberg, within "60 miles of the Island of Tahiti," and they
were then enjoying what he calls "fine weather." The libellant
all this time was lying in his berth with his leg encased in a
wooden box, subject to further injury by the shaking up, due
to the constant movement of the vessel. Honolulu was over two
thousand miles away, but no attempt was made by the captain
to make this near port of Tahiti although he had still before him
a three weeks sail to Hawaii. Papeete, on the Island of Tahiti,
a well known and settled French colony, was within a few hours'
run of his vessel, where it was reasonably certain he could have
obtained surgical attention for this injured man. It is common
knowledge that there are many medical men, and both civil and
naval surgeons, at Papeete, which is the commercial emporium
for the products of the South Sea Islands. (See *Annuaire de
Tahiti* of 1892, a government publication). Yet in defiance of
the established rules of the maritime law and the commonest
dictates of humanity, the captain of this vessel instead chooses
to carry this maimed seaman on through these tropic seas for
nearly three weeks longer deprived of the medical attention
which he was entitled to have under the law, and which was
practically within his reach. The fact that libellant did not com-
plain or insist upon his rights in this particular, can make no
difference as to what the duty of the captain of the ship was in
the premises. *The Iroquois*, 113 Fed. 964.

Thirty-two days after the injury the ship reached the port of
Honolulu, where libellant was taken ashore and placed in the
United States Marine Division of the Queen's Hospital where he
has lain ever since suffering from this injury, and from the pain
incident to two severe surgical operations upon the injured leg,
which have kept him confined in that hospital for nine months
and a half, nearly five months of that time lying in bed, unable
to walk or do anything to help himself.

The leg is deformed and three inches shorter than the other
leg, and libellant is permanently disabled thereby from follow-
ing his chosen vocation of a seaman, for he is deprived of the

power of free locomotion, walking only with great difficulty and then only with the aid of a cane. According to Dr. Cooper, a well known and reputable surgeon of Honolulu, introduced as an expert witness, he is permanently injured, although there is a possibility that by undergoing still another surgical operation, the deformity of the leg might be decreased a little and the leg rendered more serviceable, but which operation would cost something like $500. But the cause of the present condition of the leg, in the language of Dr. Cooper, is due to "the bone being allowed to go without proper surgical treatment."

It seems reasonable to suppose that if the captain of this ship had done his duty and taken libellant into Papeete on the Island of Tahiti, he might have been saved the present hopeless condition of his leg, and have been able to have had such treatment as would have enabled him to use the leg in his work as a sailor. In any event, he would have been spared some of the suffering and pain which he has endured for the past eleven months since the injury occurred.

There is no contradiction of the fact that libellant was a strong, hardy seafaring man of twenty-three when he signed aboard this ship. He is now so far as his vocation goes, a physical wreck. He has no education which would aid him in doing work other than manual, and he is now deprived of the power to do the latter, at least along the lines he had chosen and which brought him an adequate return. He was earning from twenty to thirty dollars a month as an able-bodied seaman; some twenty dollars a month while in the services of the vessel on which he was injured.

I am forced to believe that his present condition is due to the neglect and misconduct of the captain of the barkentine in failing to take libellant after he had been wounded in the service of the ship, to the nearest port for medical aid. For this neglect, libellant has an additional and different cause of action against the vessel, because a legal obligation to him had arisen to afford him suitable care and nursing. In the absence of this, the ship is liable in consequential damages. *The City of Alexandria*, 17 Fed. 390. It is competent for this Court, under the prayer

for general relief in the libel, to afford him such damages. *The Troy*, 121 Fed. 901.

There has been no laches on the part of libellant in bringing this suit. The vessel has been without this jurisdiction since the libellant was brought therein, and he has been in the hospital ever since. As soon as this vessel returned to this port, libellant instituted his action, which is within due time. *The Slingsby*, 116 Fed. 227.

I do not think that the sum of $2500 is an unreasonable amount to allow libellant in full of all damages of every kind in view of all the circumstances of this case; and that sum is allowed him, together with costs of suit.

Let judgment be entered accordingly.