## WHITNEY et al. v. OLSEN.

(Circuit Court of Appeals, Ninth Circuit. February 4, 1901.)

### No. 608.

1. ADMIRALTY—REVIEW ON APPEAL—QUESTIONS OF FACT.

In cases on appeal in admiralty, the decision of the district court on questions of fact, depending upon contradictory evidence taken in open court, will not be reversed, unless clearly against the evidence.

2. SEAMEN—INJURY WHILE IN SERVICE—DUTY OF SHIP.

Under the maritime law, a seaman who receives an injury while in the service of the ship is entitled to medical care, nursing, and attendance, and to a cure, so far as cure is possible, at the expense of the ship, and it is the duty of the master, for the performance of which the owners are responsible, to take all reasonable measures to that end.

3. SAME—TAKING INJURED SEAMAN TO NEAREST PORT—WHEN REQUIRED.

Libelant was mate on a schooner which left San Francisco on a cod-fishing cruise in Alaskan waters, all the crew being on a lay. When 500 miles from Port Townsend libelant was struck by the main boom, without fault on the part of any one, and his leg was broken in two places.

There was no surgeon on board, nor any one competent to treat the injury. Libelant asked to be taken back to shore, and the wind was favorable, but the master proceeded to Unalaska, 1,750 miles from the place of injury, which he reached in 16 days, and from that port libelant was sent back to San Francisco. By reason of the delay and the motion of the ship, libelant suffered much additional pain, and his injury was rendered permanent. *Held*, that it was the duty of the master, under the facts shown, to at once proceed to Port Townsend, which was the nearest available port where libelant could have received proper care and treatment, and that his failure to do so rendered the owners liable in damages.

Appeal from the District Court of the United States for the Northern District of California.

Myrick & Deering and Charles W. Slack, for appellants.

H. Digby Johnston, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. The libel in this case was filed to recover damages for alleged negligent, illegal, and wrongful treatment upon the part of the schooner Uranus, its owners and master. The court awarded the libelant the sum of $1,000. The schooner, on the morning of April 5, 1899, sailed from the bay of San Francisco on a cod-fishing voyage in Alaskan waters. Nelse Strangland was the master, and the libelant the third mate, of the schooner. All the members of the ship's crew were on a lay. From the testimony the court found the following facts:

"(1) That the owners of the Uranus exercised reasonable care in the matter of overhauling the tackle of the Uranus, for the purpose of making her ropes, tackle, and other appliances safe and in proper condition for the voyage referred to in the libel. (2) That upon the 16th day of April, 1899, while pursuing the voyage mentioned in the libel, the main boom lift of the vessel was carried away, and by reason thereof the main boom struck the libelant, causing him to fall and break his leg in two places, one just below the knee, and the other just above the ankle, and that said accident was not caused by the negligence of the owners of the Uranus or her master. (3) That when said accident occurred the vessel was about five hundred miles distant from Port Townsend, and the wind was at that time fair for her to make that port; that said port could have been made within four or five days, and was the nearest port, and libelant requested to be taken there, but the master refused to do so, and proceeded on his voyage, reaching Unalaska on the 2d day of May following; that the vessel was sufficiently supplied with bandages and splints, but she had no surgeon on board, or any one who knew how to properly set a fractured limb; at Unalaska the libelant was visited by a physician employed by the master for that purpose, and he gave it as his opinion that the broken leg was doing well, and that it would be better for the libelant to be returned to San Francisco, and he was then placed by the master on board the steamer Del Norte for that purpose, and reached San Francisco on or about the 14th of May, 1899, and immediately upon his arrival was placed in the Marine Hospital for treatment, where he remained a number of months; that from the time of the accident until his return to San Francisco the libelant received, while on board the Uranus and Del Norte, all the care and attendance possible to give one on shipboard, in the absence of a surgeon. (4) That the master of the Uranus was guilty of negligence in not taking the libelant after the accident to Port Townsend, the nearest port; that by reason of such negligence the libelant was subjected to protracted and unnecessary suffering; that the injuries sustained by the libelant are permanent, by reason of the fact that the fractured bones have failed to make a proper

union, and this result would probably have been avoided if the libelant had received proper surgical treatment within five or six days after the accident, and he had been placed upon shore, where his injured leg could have been kept in a position of rest. (5) That, by reason of the neglect of the master to take the libelant to the nearest port for surgical treatment, the libelant has sustained damages in the sum of $1,000 and costs."

In the specification of errors relied upon by appellants it is claimed that the court erred (1) in holding that the master of the Uranus was guilty of negligence in not taking the libelant to Port Townsend after the accident; (2) that the court erred in giving a decree against the owners of the vessel. It is contended by appellants (1) that the general rule that masters of vessels must in all cases when accidents occur on board ship put into the nearest port to give the injured seaman treatment is not imperative, and that, under the facts of this case, it was not the duty of the master of the Uranus to put into Port Townsend; (2) that if the owners used reasonable care in overhauling their vessel, and put her in proper condition before sailing, supplied her with the usual medicines and appliances for the contemplated voyage, and selected a competent master to take charge of her, they cannot be held liable for the acts of the master, within the exercise of his judgment, and that, when a competent master does what he deems best under all the surrounding circumstances, the owner cannot be charged with negligence.

The principal controversy as to the facts arises between the testimony of the master and the appellee concerning the latter's request to be taken to the nearest port. Their testimony is directly conflicting. Appellee testified that shortly after the accident, on the same day it occurred, he asked the master: "Will you be so kind as to put me back [referring to Cape Flattery]?" The master then said: "Wait; I am going to see what I can do." The next morning the master said: "I can't put you back; the nearest place is Unalaska." The master testified that appellee's request to be taken back was not made "until about a week after" the accident, and that he was then nearer Alaska than to Cape Flattery or Port Townsend. His testimony in detail is as follows:

"Q. If any accident occurred on a voyage of that kind, what is the custom,—what do you do? A. If we meet with a serious accident, we have to run into the nearest port that we can, except there is an exception like in this case. The Court: Q. You did not answer fully that question. You say that generally you run into the nearest port, but there was an exception in this case. A. Yes, sir; because I have seen lots of broken legs before. I knew it could not be set any other way, so I thought there was not any great risk to run to go up to Unalaska. * * * Another thing, it was an understanding between me and Mr. Olsen that he was going to go along to Unalaska, and stay there until I got loaded, and I was going there to take him down to San Francisco. Q. * * * You had this talk with Olsen after the accident occurred? A. Yes, sir. Q. It was agreed he should go on with you to Unalaska? A. Yes, sir. Q. And stop there? A. Yes, sir. Q. And then return with you after you got your load? A. Yes, sir. Q. Did he change his mind, and want you to turn back, at any time? A. About a week or so afterwards he wanted me to put back to Port Townsend. Q. You were then past Port Townsend? A. It was a long ways off. Q. Why did you not turn back to Port Townsend? A. Because I was nearer Alaska at the time. Q. When the accident happened, how far were you from Puget Sound? A. About 500 miles. * * * Q. Why did you not run into Puget Sound instead of going

on to Alaska? A. Because it was hard to tell. It may take just as long to run in there. You cannot depend on the wind. It is not like we have got a steamer. We could then tell when we would be there. Q. You thought it advisable to go right on your course? A. Yes, sir. Q. Instead of taking the risk of being becalmed in Puget Sound? A. Yes, sir. * * * Q. To put into Puget Sound, you would have to take the risk of favorable wind to get in there? A. Yes, sir. Q. The wind was favorable in this direction for Unalaska? A. Yes, sir. Q. And you thought it advisable to continue on your course? A. Yes, sir. Q. You thought you could make Unalaska quicker or as quick as you could make Puget Sound? A. Not quicker, but just as quick; and, when Mr. Olsen agreed to it, I did not think it was necessary to return."

What are the probabilities as to the truth of the different statements,—which is the more natural? What other circumstances, if any, tend to corroborate either of the parties? It is true that Olsen admitted that the master said, "The nearest place is Unalaska," and it is claimed that this should be taken as corroborating the testimony of the master, because it could not be true if it was said shortly after the accident occurred. On the other hand, is it reasonable to believe that Olsen, with two unset fractures in his leg,—to use the language of his counsel, "His foot shattered, racked with pain; the broken bones grating against each other and against the torn flesh with every motion of the boat; and knowing there was no one on board to reduce the fractures or give him other relief,"—would have asked to be taken to a place distant about 1,750 miles instead of a place distant about 500 miles?

It must be remembered, in this connection, that, although the master testified in chief differently, the other witnesses, and afterwards the master himself, admitted that the wind was as favorable in one direction as the other. Although in his testimony he said Olsen consented or agreed to be taken to Unalaska, yet in a letter written by him at Unalaska, May 4th, to the owners of the schooner, notifying them of the accident to Olsen, and what had been done by him, he assigned as the reason why "he had to go into Unalaska" that "I was afraid the men was going to leave if I went to the sound." If there had been an agreement with Olsen to be taken to Unalaska, does it not seem reasonable that upon the arrival of the Uranus at Unalaska the master would have given that as his reason for going there instead of to the sound? When Olsen was recalled, and his attention drawn to the testimony of the master, he was asked whether he had "ever agreed to go to Unalaska," and answered, "No, sir." After repeating the conversation he had with the master, substantially as we have before stated, he added that at that time the master said to him, "I cannot put you back; the crew is going to run away from me if I go back;" and said that this was the reason he gave for refusing his request to be taken to the sound. It does not appear from anything in the record that there had been any indication of any intention on the part of the crew, or any member of the crew, or that the master had any reason to fear that the crew would desert if he went to the sound. But we are asked to assume that, owing to the Klondike excitement existing at that time, the master had the right to expect there would be danger of the crew deserting.

In addition to all this, the appellee is to some extent corroborated by the testimony of the mate of the schooner. Olsen, in the course

of his testimony, said that he was so angry at the master for refusing his request to be taken to Cape Flattery that he (metaphorically) "chased him" out of the cabin. Matson, the first mate, called by the appellants as a witness, when asked upon cross-examination whether he did not hear Olsen complain that he was not taken to Cape Flattery, answered that he did.· "Q. On what day was it that you heard that complaint? A. Well, I don't remember the day. Q. Was it the day after the accident? A. I do not know. Q. Was it about that time? A. Somewhere around there; yes. Q. Olsen seemed to be in great pain, did he not? A. Yes, sir; the way he acted. Q. Did he complain of the motion of the ship hurting his leg and ankles? A. Yes." Does it seem reasonable that Olsen should have complained of not being taken to Cape Flattery if he had agreed to go to Unalaska, as testified to by the master? Furthermore, the answer does not contain any allegation that there was any agreement on the part of Olsen to go to Unalaska, but there is an averment "that after said Olsen was hurt  * * *  the ship was run into Dutch Harbor, as being the most available port." In the light of all these facts and circumstances, we are of opinion that the weight of the evidence supports the view that appellee requested on the day of the accident to be taken back, and did not consent or agree to go to Unalaska.

Moreover, the testimony in this case was all given in open court. In such cases this court has held that, "in cases on appeal in admiralty, when the questions of fact are dependent upon contradictory evidence, the decision of the district judge, who had the opportunity of seeing the witnesses, and judging their appearance, manner, and credibility, will not be reversed unless it clearly appears that the decision is against the evidence." The Alijandro, 6 C. C. A. 54, 56 Fed. 621, 624. The same rule has been followed in other circuits, and in the supreme court. The City of Naples, 16 C. C. A. 421, 69 Fed. 794, 796; The Brandywine, 31 C. C. A. 187, 87 Fed. 652; City of Cleveland v. Chisholm, 33 C. C. A. 157, 90 Fed. 431, 434; The E. Luckenbach, 35 C. C. A. 628, 93 Fed. 841, 843; Compania De Navigacion La Flecha v. Brauer, 168 U. S. 104, 123, 18 Sup. Ct. 12, 42 L. Ed. 398; Stuart v. Hayden, 169 U. S. 1, 14, 18 Sup. Ct. 274, 42 L. Ed. 639; The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181.

Under this rule, we decline to discuss the other minor points argued by counsel, in relation to the facts found by the court, but content ourselves with the statement that, from a careful examination of the testimony in the record, it does not appear that any of such findings are "against the evidence." On the contrary, the findings in extenso are as favorable to appellants as the testimony would warrant.

Was the master, under the facts as found by the court, guilty of any negligence in refusing to go to the nearest port after the accident occurred? If so, can the Uranus or its owners be held responsible for such negligence? What is the duty of the master and the ship in cases where a seaman is injured on board the vessel? There is no law which requires the presence of a physician or surgeon on board a vessel like the Uranus. But it was admitted by the master, and is not denied by appellants, that, in case of a serious injury to a sea-

man, it is the general custom for the master to take the ship into the nearest port when there is no surgeon on board. In fact, it was clearly his duty to do so, unless the facts and circumstances relied upon by appellants are of such a character as to justify him in the course he pursued. In discussing these questions, it must be borne in mind that the rules which govern and control them must be determined, not from the municipal law, but by the maritime law. The maritime law furnishes entirely different principles upon many subjects from the common law. Seamen are entitled to different rights from men on land. As was said by Story, Circuit Justice, in Reed v. Canfield, 1 Sumn. 195, Fed. Cas. No. 11,641:

"The policy of the maritime law, for great and wise and benevolent purposes, has built up peculiar rights, privileges, duties, and liabilities in the sea service. * * * The law of the ocean may be said in some sort to be a universal law, gathering up and binding together what is deemed most useful for the general intercourse and navigation and trade of all nations. * * * It is impossible, therefore, with any degree of security, to reason from the doctrines of the mere municipal code, in relation to purely home pursuits, to those more enlarged principles which guide and control the administration of the maritime law."

Under the maritime law it is well settled that a seaman who receives an injury while in the service of the ship is entitled to medical care, nursing, and attendance, and to a cure, so far as cure is possible, at the expense of the ship. Reed v. Canfield, supra; The Ben Flint, 1 Biss. 562, Fed. Cas. No. 1,299; Brown v. Overton, 1 Spr. 462, Fed. Cas. No. 2,024; Harden v. Gordon, 2 Mason, 541, Fed. Cas. No. 6,047; Peterson v. The Chandos (D. C.) 4 Fed. 651, 654; The City of Alexandria (D. C.) 17 Fed. 390, 393; The W. L. White (D. C.) 25 Fed. 503, 504; The Vigilant (D. C.) 30 Fed. 288; The Lizzie Frank (D. C.) 31 Fed. 477, 481; The Carlisle (D. C.) 39 Fed. 807, 5 L. R. A. 52; The A. Heaton (C. C.) 43 Fed. 592, 595.

In The City of Alexandria, the court, after citing article 6 of the laws of Oleron, article 18 of the laws of Wisbuy, article 39 of the laws of Hanse Towns, and numerous other authorities, said:

"Misconduct or neglect by the officers in the treatment of the seaman, after he has been wounded in the service of the ship, becomes a different and additional cause of action against the ship, because a legal obligation to him then arises to afford suitable care and nursing, and if this be neglected the ship may be held to consequential damages."

In Brown v. Overton, where, on a voyage from Calcutta to Boston, and 25 days before passing within sight of St. Helena, a seaman fell from aloft, and broke both legs, it was expressly held that it was the duty of the master to have put into St. Helena for the cure and relief of the seaman. In the course of the opinion the court said:

"A seaman disabled in the service of the ship is to be cured at the expense of the ship. To this his right is as perfect as to food or wages. It is incumbent upon the master to furnish means of cure, and to use all reasonable exertions for that purpose. Scarcely a case can be presented where this obligation applies with greater force than the present. This seaman, at the command of his officer, had exposed his life and his limbs for the preservation of the ship. He was thrown from the yardarm, and both legs were badly fractured. There was no surgical skill on board, and the unceasing motion of the ship, and the accidents and discomforts to which he was necessarily exposed, were unfavorable to his cure. The master intended to go within

sight of St. Helena, and, if he had shaped his course to go into port, he might, with only a few hours' detention, have consulted the American consul, obtained surgical aid and advice, and ascertained how far it was necessary, or would be useful, for the libelant to be left on shore. The reason assigned by the master, since his return, for not having left this seaman at St. Helena, is that it would have occasioned expense. This presents not the least extenuation. It is merely saying that, if he had performed his duty, the owners would have been subjected to a burden which the law imposes. The master ought to have gone into St. Helena, to have given to the seaman the means of cure, which that place afforded, and for this neglect the libelant is entitled to recover such damages as he sustained."

In Peterson v. The Chandos, which we will have occasion again to refer to, this duty of the master was specially recognized. The court said:

"If it had been shown that the vessel could, under the circumstances, make about ten miles an hour, and thereby have made Valparaiso in a little more than five or six days, it might have been proper for the master to have gone in there; indeed, I think it would have been his duty to do so."

For the purpose of this opinion, it will be admitted that the rule requiring the master of vessels to go into the nearest port, in order to give the injured seaman treatment, is not an imperative one; that, in the nature of things, there must be some limit to the obligation of the ship to seek aid outside of the vessel. It depends upon the facts and surrounding circumstances of each particular case. If Olsen had agreed with the master to go to Unalaska, he could not have complained of the master's failure to go to Port Townsend. In the Chandos Case it was held that it could not be assumed from the evidence that the port of Valparaiso could have been made in less than two weeks, and the court was of opinion that the vessel was not under obligation to make that sacrifice of time and risk of cargo for the libelant. Here it would only have taken four or five days to reach Port Townsend. There was no cargo on board; no danger of loss or damage on that account. The wind was fair and favorable. There was no peril to the ship. But it is argued that the master was justified in pursuing the course he did, and was not guilty of any negligence, because the vessel was on a cod-fishing cruise, and the men were sailing on a lay, and the master had no right to make the men work the schooner into the sound and out again for nothing, subjecting the vessel to possible actions for damages for the extra labor. This contention, in the light of all the testimony disclosed by the record, cannot be sustained. It does not appear that any of the men were consulted upon the subject of the deviation. It is not shown that any of them objected to going to the sound. There is no testimony on this subject. The master gave no such reason for refusing the libelant's request.

How could the vessel, its owners, or master be held responsible in damages in performing their duty under the law? There might have been additional expense incurred, but this presents no excuse,—"not the least extenuation." If the master had performed his duty, and taken the injured seaman to Port Townsend for treatment, the vessel and its owners would simply "have been subjected to a burden which the law imposes." No member of the crew could complain, or hold the ship responsible in damages, for loss of time necessarily incurred

in the discharge of its duty. Necessity and humanity, as well as the principles of the admiralty law, would have amply protected the owners of the ship from such loss. Even if the additional expense then incurred could be considered, it is questionable, to say the least, if there would not have been, in this particular case, a saving instead of a loss ultimately incurred.

The cases of Peterson v. Swan, 53 N. Y. Super. Ct. 151, and The Wensleydale (D. C.) 41 Fed. 602, relied upon by appellants to sustain their contention that the Uranus cannot be held responsible for any error of judgment on the part of the master, relate solely to actions where damages were sought to be recovered for the negligence of the master in treating injuries of seamen in the absence of a surgeon on board the ship. They have no application to the facts of this case. The Uranus was not held liable for any negligence in that respect. The only damage allowed to appellee was for the negligence of the master in not taking him to the nearest port, where proper surgical skill could have been procured. With reference to this point, it cannot be said that the master exercised his own best judgment, or, in fact, any judgment at all. He relied upon the consent and agreement of Olsen to be taken to Dutch Harbor, and that he did not request to be taken to the sound until a week after the accident, when the vessel was as near Unalaska as Port Townsend. The appellants, however, failed to establish these points. The master testified that he did not "think it was necessary to return" to the sound "when Mr. Olsen agreed" to go to Unalaska. There is a suggestion made that the libelant did not request to be taken to Port Townsend, but to Cape Flattery. There is no merit in this suggestion. Cape Flattery is on the coast. Port Townsend is on Puget Sound. These places are not far distant from each other. There is a marine hospital at Port Townsend, and that is where the libelant could have received proper medical treatment, and where the master should have taken him. The ship's obligation to the libelant did not depend on his precise geographical location of the nearest port. This case was evidently well tried in the district court, and was ably argued in this court. The whole case has been examined by us with great care. We find no error that would justify a reversal. The decree of the district court is affirmed, with costs.