[No. 25626.   Department Two.   September 5, 1935.]

ANTONIA ANELICH, *as Administratrix, Respondent,*
v. THE ARIZONA *et al., Appellants.*[1]

[1]Reported in 49 P. (2d) 3.

468

*Ralph S. Pierce, Edwin J. Cummins,* and *Gordon H. Sweany,* for appellants.

*Charles A. Wallace* and *Wilbur Zundel,* for respondent.

BLAKE, J.—This is an action brought under the Jones act to recover damages resulting from the injury and death of plaintiff's intestate while hauling in a purse line by means of a power winch on the purse seine fishing vessel, Arizona. The vessel, its owner, Antone Mardesich, and its master, Peter Mardesich, were all made parties defendant. The action is predicated upon the negligence of the defendants in that: (a) The clutch on the winch, by which it was connected and disconnected with the drive shaft, was old, worn and defective; (b) defendants failed to exercise reasonable care in providing medical attendance and hospitalization for deceased after he was injured.

The defendants joined issue, denying negligence and setting up, by way of affirmative defenses, contributory negligence and assumption of risk. The court submitted the case to the jury on the issues of negligence and contributory negligence, but declined to submit the defense of assumption of risk, holding, as a matter of law, that such defense was not available to defend-

ants under maritime law. The jury returned a verdict for plaintiff in the sum of $10,500. From judgment on the verdict, defendants appeal, making fifteen assignments of error. We shall attempt to discuss these in what appears to us to be the order of their importance.

In respect to assumption of risk, we understand appellants to contend (a) that the common law doctrine of assumption of risk has always been applicable to torts at sea; (b) that if not, it has been made so by the terms of the Jones act.

It is too well settled for discussion that the vessel and its owners are liable for indemnity, under general maritime law, for injuries sustained by seamen in consequence of a failure to supply and keep in order proper appliances appurtenant to the ship. For failure to do so, the ship and owner, not the seamen, assume the risk. *The Osceola,* 189 U. S. 158, 23 S. Ct. 483; *Cricket S. S. Co. v. Parry,* 263 Fed. 523; *Storgard v. France & Canada S. S. Corporation,* 263 Fed. 545; *Henry Gillen's Sons Lighterage v. Fernald,* 294 Fed. 520; *Grimberg v. Admiral Oriental S. S. Line,* 300 Fed. 619; *Grant v. United States Shipping Board Emergency Fleet Corporation,* 22 F. (2d) 488; *Howarth v. United States Shipping Board Emergency Fleet Corporation,* 24 F. (2d) 374; *Ives v. United States,* 58 F. (2d) 201.

The argument that the common law doctrine of assumption of risk is made available as a defense by the Jones act is this: That act, by its terms, provides that the seaman, or, in case of death, his personal representative, may maintain an action at law, in which case,

"All statutes of the United States modifying or extending the common law right or remedy in cases of personal injury to railway employees shall apply." Title 46, U. S. C. A., § 688, 41 Stat. 1007.

The argument proceeds: Since the doctrine of assumption of risk is available under the Federal employers' liability act, it is, by reason of the above stated terms of the Jones act, made available in actions brought by seamen.

The position of appellants is against reason and authority. *Hansen v. United States,* 12 F. (2d) 321; *States S. S. Co. v. Berglann,* 41 F. (2d) 456. The effect of the Jones act was to enlarge, rather than restrict, the rights of seamen injured in the course of their employment. Its avowed purpose was to afford them an action at law, with a right of trial by jury—a right which they did not have in admiralty. The act does not purport to change the rules of maritime law by which their rights were theretofore determined. The result, if appellants' position were accepted, would be to defeat the very right granted by the Jones act. For the injured seaman would hardly hazard the chance of his action at law being defeated under the doctrine of assumption of risk, when he could go into admiralty and escape the hazard of that defense.

Appellants contend that, in any event, there was no causal connection between the defective clutch and the injury sustained by plaintiff's intestate. The crew, with the exception of the engineer, were Slavonians and ordinarily used their native language about their work. The engineer did not understand the Slavonian language. The winch was located about midship. It had two drums—forward and aft. Near the forward drum was a lever by which the clutch of the winch was engaged and disengaged from the drive shaft. The shaft was driven by a semi-Diesel engine, which furnished all the power for the vessel. There was a clutch at the engine designed to engage and disengage all machinery, including the propeller shaft.

At the time of the accident, the crew was engaged in

hauling in the purse lines. There were two such lines, which were brought onto the vessel through blocks attached to a davit. Thence, the lines extended to the aft and forward drums of the winch, respectively. Three or four turns of the line were had around the drum. A man pulling at the rope created the friction necessary on the drum to haul in the line.

The deceased was so engaged on the aft line. He was heard to shout in his native tongue: "Oh, Mother of Mine, my leg is caught." The winch was stopped by the engineer, who disengaged the clutch controlling all of the machinery at the engine. Before the machinery was stopped, however, deceased's leg was pulled onto the aft drum of the winch, where it was broken and crushed between the purse line and the drum. The leg was so firmly caught that, in order to release it, the line had to be cut from the drum with an axe.

While there was conflict in the evidence, the jury were warranted in finding that the clutch was so old, worn and defective that it would slip out under the pull of a heavy load, unless the handle of the lever was so braced as to hold it. It was not denied that there was a forked stick kept tied to the starboard bitt of the winch for that purpose. It was used by placing the forked end against the handle of the lever, after the clutch was enmeshed, and the other end against cleats nailed onto the bitt. There was evidence to the effect that this stick was not being used at the time of the accident. We think, however, that there was sufficient circumstantial evidence for the jury to find that it was.

The owner of the vessel was standing within a few feet of the clutch lever, yet he did not disengage the clutch. He shouted to the engineer, who stopped the winch by disengaging the clutch at the engine. It is contended that the winch was stopped just as quickly in this manner as it could have been by disengaging

the clutch at the winch. This, it seems to us, was for the jury to say. The engineer could not understand deceased's cry of distress. The owner of the vessel did. It is reasonable to believe that, had the stick not been used, he could and would have reached the clutch lever in the time it took him to call to the engineer. Had he done so, it is reasonable to believe that the winch could have been stopped before deceased's leg got wound up in the drum.

Appellants contend that the court erred in receiving evidence of the condition of the clutch at the time of trial, some fourteen or fifteen months after the accident. An engineer, having just examined the clutch, testified that it was so worn and defective that it would not hold, under the pull of a heavy load, without pressure against the handle of the lever; that the forked stick was designed to exert the pressure on the handle necessary to hold the clutch enmeshed; that the condition of the clutch was the result of many years of use; and that, in his opinion, the clutch was in practically the same condition at the time of the trial as it was at the time of the accident.

Conceding the testimony inadmissible, the error in receiving it was harmless. Another engineer testified that he examined the clutch a month after the accident and again at the time of the trial, and that its condition was the same.

It is also urged that the court erred in admitting in evidence a photograph showing the forked stick in place against the handle of the clutch lever. The assignment is without merit. The photograph was merely designed to show *how* the forked stick was used. It was not intended to serve as substantive proof of the fact that the stick was in use at the time of the accident. *Gooschin v. Ladd,* 177 Wash. 625, 33 P. (2d) 653.

■ It is also contended that Anelich was not a seaman in contemplation of maritime law. This contention is not tenable. To be a seaman, within the contemplation of maritime law, a man's duties do not necessarily have to be concerned with the navigation of the vessel. *Howarth v. United States Shipping Board Emergency Fleet Corporation, supra; Grant v. United States Shipping Board Emergency Fleet Corporation, supra.*

■ Appellants next contend that the court should not have submitted to the jury the question of negligence in respect to the treatment and hospitalization of deceased after the accident. The argument is that, under the undisputed evidence, it appears that appellants did all that was reasonably possible in respect to the obligation imposed upon them by law.

The accident occurred about eight-thirty a. m., August 1, in Mitchell bay—some fifteen miles from Friday Harbor. At the time, the cork line of the purse seine was all about the vessel. While in such a situation, the vessel could not be moved under its own power. Consequently, within fifteen or twenty minutes, the injured man was transferred to another fishing vessel, the Congress. Shortly after that, he was again transferred to a "fish buyer," the Excel II. The reason for the second transfer was that the Excel II was a faster boat.

It proceeded to Friday Harbor, where it arrived about ten-thirty. There the wound of the injured man received attention for the first time, no attempt at first aid or aseptic treatment having theretofore been made, except the application of a tourniquet. The physician at Friday Harbor performed all the service that he was equipped to perform—cut away dead tissue, cleansed the wound, and placed the leg in a splint. Anelich remained in the physician's office until five-thirty p. m.,

when he was picked up by a coast guard cutter and taken to the Marine hospital, in Seattle. He arrived there at ten-thirty p. m. No operative treatment was attempted until the next morning. Two or three days later, general septicæmia developed, from which death resulted August 8.

It seems to us, under this evidence, the jury might very well find that adequate treatment and hospitalization was unreasonably delayed, and, but for the delay, Anelich's life might have been saved. But, appellants contend, under the evidence, the organisms which subsequently caused septicæmia entered the wound at the time of injury; that, consequently, to say that septicæmia resulted from delay in treatment is purely speculative. We think, however, that the jury might reasonably infer from the medical testimony that the longer the delay in effecting adequate aseptic treatment and hospitalization, the more likely is the development of septicæmia. See *Cortes v. Baltimore Insular Line,* 6 Fed. Supp. 604. In that case, the court said:

"If in this case we accept as established the fact of negligent conduct of the defendant and deny recovery on the ground of insufficient proof of causal connection with death, there will be left open a class of cases under a statute intended for the protection of the health and safety of seamen where neglect of duty can be admitted with impunity. The spirit of our jurisprudence, while fostering conclusiveness and certainty, does not look with favor upon nurturing wrongdoing and denying a remedy. The nearest approximation to reasonable justice in this case necessitates the denial of the motion to dismiss."

As to what might be required in the exercise of reasonable care in respect to treatment and hospitalization, the court admitted evidence concerning the distance of Victoria and Bellingham from the place of the accident; also, evidence of the possibility of trans-

porting the injured man by airplane to the Marine hospital at Seattle. This was all competent, under the rule of maritime law, as stated in *Whitney v. Olsen,* 108 Fed. 292:

"There is no law which requires the presence of a physician or surgeon on board a vessel like the Uranus. But it was admitted by the master, and is not denied by appellants, that, in case of a serious injury to a seaman, it is the general custom for the master to take the ship into the nearest port when there is no surgeon on board. In fact, it was clearly his duty to do so, unless the facts and circumstances relied upon by appellants are of such a character as to justify him in the course he pursued. In discussing these questions, it must be borne in mind that the rules which govern and control them must be determined, not from the municipal law, but by the maritime law. The maritime law furnishes entirely different principles upon many subjects from the common law. Seamen are entitled to different rights from men on land. . . .

"Under the maritime law it is well settled that a seaman who receives an injury while in the service of the ship is entitled to medical care, nursing, and attendance, and to a cure, so far as cure is possible, at the expense of the ship."

Appellants argue that, since the Arizona followed the Excel II to Friday Harbor as speedily as possible, and since they made every effort to contact the coast guard (which was the usual method of getting injured seamen from that locality to the Marine hospital), they fulfilled their obligation to care for Anelich after his injury; that to fulfill such obligation they were not required to provide airplane ambulance service. Of course, as a matter of law, they were not required to furnish airplane ambulance service. But the evidence showed that the place of the accident was but an hour by airplane from Seattle; that airplane service was available. Under the evidence, the jury might well have concluded that, by such service, Anelich could

have reached the Marine hospital within three or four hours after the accident.

That appellants did all that they thought of in taking care of the injured man is not determinative of their obligation. Whether they acquitted themselves of their obligation in this respect was, under the facts and circumstances disclosed by the record, a question for the jury. See *The C. S. Holmes,* 237 Fed. 785; *Brown v. Overton,* Federal Case No. 2,024 (4 Fed. Cas. 418).

Appellants urge that the court erred in submitting, as an element of damages, pain and suffering endured by Anelich between his injury and death. Counsel make an interesting argument in support of this position, but, since the pertinent authorities are to the contrary, we do not feel it is necessary to state or analyze the argument. *Luckenbach S. S. Co. v. Campbell,* 8 F. (2d) 223; *Thornton v. Puget Sound Power & Light Co.,* 49 F. (2d) 347. In the former case, speaking for the ninth circuit court of appeals, Judge Rudkin said:

"If the recovery must be limited to the pecuniary loss to the estate, the allowance would seem liberal, to say the least, but the statute on which the action was based is a survival statute, under which there may be a recovery for pain and suffering. *St. Louis & Iron Mt. Ry. Co. v. Craft,* 237 U. S. 648, 35 S. Ct. 704, 59 L. Ed. 1160."

Judgment affirmed.

STEINERT, HOLCOMB, and MITCHELL, JJ., concur.