**LOVERICH v. WARNER CO.**
No. 145.
District Court, E. D. Pennsylvania.
June 24, 1940.
Case Remanded March 17, 1941.

Freedman & Goldstein, of Philadelphia, Pa., for libelant.

Shields, Clark, Brown & McCown, of Philadelphia, Pa., for respondent.

KALODNER, District Judge.

This suit was instituted by a libel in admiralty seeking (1) indemnity and (2) maintenance and cure on account of personal injuries allegedly suffered by libellant, a maritime worker, during the course of his employment. Trial was by the court without a jury.

It appears that Frank B. Loverich, the libellant, was employed in 1925 as master of the all-steel oil barge O—1, by the Hainesport Mining & Transportation Co., the assets of which were transferred in 1929 to an associated company, the Van Sciver Corporation; in the same year, 1929, these combined assets were transferred by the Van Sciver Corporation to respondent, the Warner Co., which agreed to assume the liabilities of the Van Sciver Corporation which previously had assumed the liabilities of the Hainesport Co. Libellant testified that on the night of January 23, 1926, while he was asleep in his cabin on the barge, a fire started in the wooden coal box, located above the cabin and supplying a stove therein; that shortly after midnight, about 12:30 A. M., he was awakened by smoke and coal fumes which filled the cabin; that, nearly overcome, he made his way from the cabin clad only in his underwear; that the night was extremely cold and the river was covered with ice; that he returned to the cabin for his shoes and, still thinly clad, fought the fire with buckets of water which he obtained by breaking through the ice with a slice bar; that, at 5:15 A. M., when the fire nearly was extinguished, a tug boat arrived and took him off the barge. (R. 17-20, 57-63.) Libellant testified that he went to work the very next day and worked continuously thereafter, without losing any time on account of illness, until June 1933 when he left his employment on the barge because of attacks of dizziness and a severely sore throat. (R. 27, 28.) He declared, further, that after the fire he developed a sore throat which continually grew worse; that on several occasions thereafter he was sent by Mr. Thomas, his immediate superior, to a company doctor for examination and treatment. (R. 22-27; 68, 69.) Thomas, however, denied sending him to any doctor prior to 1933 when he left the barge. (R. 117, 118.) In this, Thomas was corroborated by Dr. A. H. Rihl, the company doctor whom libellant claimed to have visited during the period immediately following the fire. (R. 144, 145.) In June, 1933, libellant testified that

he became so sick that he was forced to leave the barge, then at Baltimore, and to return to Philadelphia. (R. 28, 64.) Upon his return, he was examined by the company physician, Dr. Rihl, who found him to be suffering from advanced arteriosclerosis and chronic laryngitis, and advised that "he was a poor risk to work, especially around machinery or on a boat". (R. 29, 141.) Several weeks later, on July 6, 1933, libellant received a letter of dismissal stating that he was an industrious employee who was obliged to leave his job on account of illness. (R. 32, 33.)

Libellant did not work from the time he left the barge in June, 1933, until approximately the beginning of the second week in February, 1934, when he obtained employment with the Reading Co. (R. 41-43.) From November 20, 1933, until January 18, 1934, he was treated at the Stapleton Hospital, Ellis Island, N. Y. (Libellant's exhibit, No. 4.) About twenty days after his discharge from the hospital, libellant went to work for the Reading Company, with whom he remained for approximately fourteen months. (R. 40.) From March 5th until March 8th, 1935, libellant was under examination at the Philadelphia General Hospital. (Libellant's exhibit, No. 9.) Shortly thereafter, he obtained another job with the Loveland Company which continued for fifteen months. (R. 40.) He has been unemployed since. (R. 44.) From May 16th until September 19th, 1939, libellant again was at the Philadelphia General Hospital, during which time his throat condition was diagnosed as malignancy (cancer) (R. 89) and an operation therefor was performed. (R. 44, 88, 89.) The instant libel was filed on October 24, 1939.

With regard to the causal connection between the fumes and exposure and the cancerous condition, Dr. Joseph Gelehrter, of the Philadelphia General Hospital, testified that "we don't know the exact cause of malignancy, but we do know that chronic irritation is a factor in producing malignancy". (R. 96.) He declared further, "It could be a factor. It wouldn't be the cause by itself". (R. 98.) B. M. Thomas, the marine superintendent and libellant's immediate superior, testified that libellant had a huskiness in his throat when he first was employed in 1925. (R. 123.)

With respect to the alleged negligence of the Hainesport Company, the testimony of James Kesson, maintenance superintendent at the time, displayed a very hazy memory and considerable uncertainty as to many details relating to the construction, in 1926, of the wooden coal box atop the cabin, the fire and the subsequent repairs. (R. 125 et seq.; 148 et seq.) Thomas, the marine superintendent, testified very generally concerning the construction of the cabin and the coal box above (R. 114); however, he made no inspection after the fire. (R. 116, 121.)

At the close of libellant's evidence, respondent moved to dismiss the libel on the ground of laches. Opposing the motion, libellant contended that unless it appeared that respondent was prejudiced by the delay in bringing suit, the motion should not be granted. The Court denied the motion with leave to renew it at the conclusion of respondent's testimony and the defense proceeded. (R. 113.) At the close of respondent's evidence, the motion to dismiss was renewed. (R. 164.)

With regard to the claim for indemnity, a review of the testimony and the situation it discloses clearly demonstrates that the motion to dismiss because of laches must be granted.

Absent special extenuating circumstances, in fixing the time limitations which will bar a suit in admiralty because of laches, founded upon undue and prejudicial delay, federal courts generally have had resort to the analogy of state statutes of limitations. Stampalia v. Murphy, D.C., 34 F.2d 660. In Pennsylvania, the statute of limitations governing actions to recover damages for personal injuries is two years. 12 P.S.Pa. § 34. In the present case, nearly fourteen years elapsed from the time of the original injury alleged and the date of the filing of the instant libel. Not only has the analogous two year period of limitations long since elapsed but the presumption of prejudice which may be regarded as arising from such extended delay has not satisfactorily been rebutted. On the contrary, the witnesses called at the trial to testify as to the construction of the vessel in 1926 displayed, with believable sincerity and understandable cause, but scant recollection of the relevant details involved. It may be observed also, and significantly so, that when Congress decided to fix a reasonable period of limitations on the bringing of suits under the Jones Act, 46 U.S.C.A. § 688, based upon the employer's culpable conduct, it determined upon a maximum period of three years (originally only two years). Considering all the circumstances in this

case, it is the opinion of this Court that the delay has been not only inexcusably undue but also prejudicial to respondent.

■ Further, it appears from the testimony that the claim for indemnity must fall, also, because of libellant's failure to show a causal connection between the fumes and exposure in 1926 and the cancerous condition of his throat in 1939. As indicated previously, libellant's own expert witness, Dr. Gelehrter, providing the sole testimony on the issue, declared that the exact cause of malignancy was unknown to the medical profession. Upon being asked the following question by the Court (R. 98): "Q. Assuming he was in the smoke two and a half hours, and assuming for five hours thereafter he was exposed to the elements on a January night carrying water, while wet and in the cold, and the malignant condition developed a number of years later, would you say that that would be the cause of it?" Dr. Gelehrter replied: "A. No sir. He would have this predisposing cause. It could be a factor. It wouldn't be the cause by itself. I wouldn't say that."

Thus, not only was there no expert medical testimony that the event in question was the probable cause of the injury complained of, necessary to establishing the sufficiency of the proof of the causal relationship, Bruggeman v. York, 254 Pa. 430, 435, 98 A. 970; Glenn v. Stewart, 265 Pa. 208, 214, 108 A. 599; Stauffer v. Susquehanna Collieries Co., 116 Pa.Super. 277, 282, 176 A. 740, but the testimony of libellant's own witness negatives the possibility of such a finding of fact. It is clear, therefore, that the necessary causal connection has not been established.

Because of somewhat different considerations, libellant's claim for cure and maintenance must be allowed to the limited extent hereinafter to be determined.

■ It has oft been stated that the right to cure and maintenance is a contractual one engrafted by the policy of the law upon the contract of employment between the seaman and the shipowner. Pacific S. S. Co. v. Peterson, 278 U.S. 130, 138, 49 S.Ct. 75, 73 L.Ed. 220; Cortes v. Baltimore Insular Line, 287 U.S. 367, 371, 53 S.Ct. 173, 77 L.Ed. 368; Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 527, 58 S.Ct. 651, 82 L.Ed. 993. Consequently, in barring suits for maintenance and cure because of laches, courts generally have applied the state statute of limitations governing actions for breach of contract. Cresci v. Standard Fisheries, D.C., 7 F.2d 378; Marshall v. International Marine Co., 2 Cir., 39 F.2d 551. In Pennsylvania, as in many other states, this is six years. 12 P.S. Pa. § 31. Although agreed on the foregoing, the existing case law is silent on the question of when the six year period begins to run. In reaching a decision on this important question, so many fundamental concepts regarding maintenance and cure must be considered that it appears desirable, for purposes of clarity, to note herein the general nature of the right involved.

■ It is an ancient and well-established principle of the maritime law that a seaman falling ill or injured while in service is entitled to "maintenance and cure" at the expense of the vessel and her owner, The Osceola, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760, provided, however, that such illness or injury did not result from the seaman's own wilful misconduct, Oliver v. Calmar S. S. Co., 33 F.Supp. 356, decided by this court, March 6, 1940. The duty is one imposed by the law itself and is inextricably annexed to the employment. "Contractual it is in the sense that it has its source in a relation which is contractual in origin, but, given the relation, no agreement is competent to abrogate the incident." Cortes v. Baltimore Insular Line, supra, 287 U.S. at 371, 53 S.Ct. at 174, 77 L.Ed. 368. As stated by Mr. Justice Stone in Calmar S. S. Corp. v. Taylor, supra, 303 U.S. at 527, 528, 58 S.Ct. at 653, 82 L.Ed. 993, the duty "does not rest upon negligence or culpability on the part of the owner or master, Id.; The City of Alexandria, D.C., 17 F. 390; The Mars, 3 Cir., 149 F. 729, 731; Sorensen v. Alaska S. S. Co., D.C., 243 F. 280, affirmed, 9 Cir., 247 F. 294; Brown v. The Bradish Johnson, C.C., Fed. Cas. No. 1,992, 1 Woods 301, nor is it restricted to those cases where the seaman's employment is the cause of the injury or illness, The Wensleydale, D.C., 41 F. 829; The Bouker No. 2, 2 Cir., 241 F. 831. It is not an award of compensation for the disability suffered, The Wanderer, C.C., 20 F. 140, 143, although breach of the duty may render the owner liable for the consequential damages suffered by the seaman. Cortes v. Baltimore Insular Line, supra, 287 U.S. 367, at page 371, 53 S.Ct. 173, 174, 77 L.Ed. 368. The maintenance exacted is comparable to that to which the

seaman is entitled while at sea, The Henry B. Fiske, D.C., 141 F. 188, 192; The Mars, D.C., 145 F. 446, 447, affirmed, 3 Cir., 149 F. 729; The Bouker No. 2, supra, 2 Cir., 241 F. 831, at page 836, and "cure" is care, including nursing and medical attention during such period as the duty continues, Whitney v. Olsen, 9 Cir., 108 F. 292, 297 and cases cited; Dougherty v. Thompson-Lockhart Co., D.C., 211 F. 224, 227. * * * The reasons under-lying the rule, to which reference must be made in defining it, are those enumerated in the classic passage by Mr. Justice Story in Harden v. Gordon, C.C., Fed. Cas. No. 6,047: The protection of seamen, who, as a class, are poor, friendless and improvident, from the hazards of illness and abandonment while ill in foreign ports; the inducement to masters and owners to protect the safety and health of seamen while in service; the maintenance of a merchant marine for the commercial service and maritime defense of the nation by inducing men to accept employment in an arduous and perilous service." If the injury or illness outlasts the voyage, the right to maintenance and cure continues for a reasonable time thereafter, depending on the particular circumstances of each case. Should the disease prove incurable, the period is not thereby indefinitely prolonged; the duty still extends only a fair time beyond the termination of the voyage. It is clear that the policy of the law underlying the imposition of the obligation can demand no more. Id., 303 U.S. at 529, 530, 58 S.Ct. 651, 82 L.Ed. 993.

The period during which a seaman is entitled to maintenance and cure after the termination of the voyage because of disabilities suffered which render him, for the time being, unfit to obtain other employment and thereby to maintain himself, of course will end when he has recovered sufficiently from his disabilities so as to be employed once more. Cf. The Ball Bros., D.C., 35 F.2d 261. That such should be the case is a logical sequence of the reason behind the rule. It is important to reiterate, in this connection, that the right involved is not one to compensation for disabilities suffered. For injuries sustained because of the culpable conduct of the shipowner, a seaman may always secure complete redress either by seeking indemnity, under the old admiralty practice, or by securing damages under the Jones Act, supra.

Finally, the duty of maintenance and cure has been held to be a continuous one on the part of the shipowner during the period for which it exists, for the non-performance of which the seaman may libel his employer from time to time during the continuance of the obligation. Calmar S. S. Corp. v. Taylor, supra; Delpy v. Crowley Launch & Tugboat Co., 9 Cir., 99 F.2d 36.

With the foregoing background, the immediate question may now be considered. It is evident that the shipowner's duty to provide maintenance and cure first arises when, during the course of his employment, a seaman is so injured or becomes so ill that he is obliged to cease his work. Thereafter, as long as his employer secures him with maintenance and provides him with care, including such nursing and medical attention as may be necessary, no breach of duty has occurred. However, the aforesaid duty having arisen, should the shipowner at any time thereafter fail to maintain the disabled seaman as required by his contractual obligation implied by law, at that moment a breach of the implied contract will have occurred and the six-year period of limitation will have begun to run. Inasmuch as the obligation has been viewed as a continuous one throughout the period during which it exists, it must follow that a continuous failure to provide maintenance and cure must be regarded as giving rise to successive breaches of contract with successive six-year periods of limitation commencing anew from day to day.

As applied to the instant case, inasmuch as libellant worked continuously from the date of the fire until June, 1933, the period during which libellant was entitled to maintenance and cure first began with the day in June, 1933, when he was obliged to leave his employment with the respondent company because of illness, and continued until the beginning of the second week in February, 1934, when he obtained employment with the Reading Company. It must be stressed that libellant's right to maintenance and cure is premised solely on the unquestioned illness and the attending disability which existed at the termination of his employment with the respondent, and is completely independent of, and unrelated to, any events prior to that time. To the extent that it failed to maintain libellant during this period subsequent to the termination of

his employment, respondent must be charged with successive breaches of its implied contractual obligation. Inasmuch as the instant libel was filed on October 24, 1939, libellant is precluded from recovering for maintenance and cure accruing prior to October 24, 1933, keeping in mind the six-year statute of limitations previously noted. Accordingly, the libellant appears to be entitled to maintenance and cure for the period from October 24, 1933, to February 7, 1934,[1] at the stipulated rate of $2 a day (R. 47), with the exception of the period from November 20, 1933, until January 18, 1934, when he was hospitalized at the Stapleton Hospital, Ellis Island, N. Y.

---

[1] Libellant testified that he obtained employment with the Reading Company twenty days after his discharge from the Stapleton Hospital, Ellis Island, N. Y., which was on January 18, 1934. (Libel-lant's exhibit, No. 4; R. 43) Thus, his employment with the Reading Company would appear to have begun on February 7, 1940..