Stauffer, Appellant, *v.* Susquehanna Collieries
Company.

Argued December 12, 1934.

Before TREXLER, P. J., KELLER, CUN-NINGHAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*Roger J. Dever,* for appellant.

*Henry A. Gordon,* and with him *T. G. Wadzinski,* for appellee.

OPINION BY PARKER, J., February 1, 1935:

The referee and board in this workmen's compensation case found that Alex Stauffer, husband of the claimant, died an accidental death by drowning while in the course of employment with defendant. On appeal, the court of common pleas remitted the case to the board for further hearing. The referee and board again found for claimant and the court below, on appeal, entered judgment for the defendant on the ground that there was not sufficient evidence to support the judgment. This presents the sole question for our consideration.

The decedent, a hoisting engineer employed by the defendant company, was given light laboring work

owing to the fact that he had developed high blood pressure. His task was to keep chips and dirt from a screen on an intake to a pipe at the end of a trough of water so that the passage of water would not be impeded. He was seen at his work about an hour before his body was found floating in from ten inches to a foot of water in the trough which was about five feet wide and twelve feet long. At the second hearing, the undertaker testified: "A. During the course of embalming there was a liquid—water or liquid ran from the nose and mouth—nostrils and mouth and in order to overcome this purge, as we call it, I had to tap the lung with a trocar. Q. What did you do, extract something from the lung like water in your trocar? A. Yes, I took some fluid—liquid out. Q. Do I understand the subject was purging or that something was coming from his mouth and nose? A. During the course of embalming, yes, sir. Q. To correct that condition you went in with a trocar? A. Yes. Q. How much fluid did you take out with the trocar? A. Oh, probably a quart and a half to two quarts. Q. What did the substance look like that was coming from him before you went into him with the trocar? A. Liquid—a white liquid. It looked like water, possibly water, and there was air bubbles coming from the nostrils. Q. What was the appearance of the stuff you took out with the trocar? A. Of course, that was mixed, most everything—a little blood in it, fluid, liquid. Of course, I couldn't tell what was in it. I don't know. There was some water in it, I suppose." At the first hearing he had testified that he took out some liquid but "not a whole lot."

The claimant did not call a physician to testify to the cause of death, but relied upon the inferences that might be drawn from the fact that the body was found floating in ten or twelve inches of water and the testimony by the undertaker that he took one or two quarts

of liquid from the lungs of the corpse. The defendant called as witnesses two physicians, one of whom stated he saw the body of decedent while at the mine hospital and that the evidence suggested that Stauffer did not die of drowning but that death might have been due to heart failure, apoplexy, or "a number of causes." The other physician, employed by the defendant, gave it as his professional opinion that death was due to apoplexy. There was some conversation between the claimant and officials of the defendant company with reference to holding an autopsy, when claimant objected and signed a statement prepared by a representative of the defendant which was, in part, as follows: "I am satisfied that his death was not due to an accident or an injury received while in your employ, but that he died from natural causes, and that I will not claim any compensation from your company because of his death. I, therefore, request that you will please make no further investigation into the cause of his death." After the body was removed from the trough, considerable time was spent by a first aid crew in attempting to start respiration. Although they worked for fifteen minutes, no water came from his mouth.

In compensation cases, our revisory powers are limited to a determination of the question whether there is evidence to support the findings and whether the law has been properly applied to them: Laraio v. Penna. R. R. Co., 277 Pa. 382, 121 A. 325. The burden was on the claimant to prove her case by a preponderance of the evidence: Condron v. P. & R. C. & I. Co., 78 Pa. Superior Ct. 133; Keyes v. N. Y. O. & W. R. R., 265 Pa. 105, 108 A. 406.

"*Where no facts appear indicating anything to the contrary,* it may be presumed logically that an employe at his regular place of service, during his usual working hours, is there in discharge of some duty incident to his employment; and, when the dead body of

an employe is found on the premises of his employer, at or near his regular place of service, under circumstances fairly indicating an accidental death which probably occurred during the usual working hours of the deceased, the inference may fairly be drawn, *in the absence of evidence to the contrary,* that the employe was injured in the course of his employment'' (Italics supplied): Flucker v. Carnegie Steel Co., 263 Pa. 113, 119, 106 A. 192; Dannals v. Sylvania Township, 255 Pa. 156, 99 A. 475. The Flucker case is also authority for the proposition that when a fact finding body has considered all of the circumstances in order to determine how far they should prevail against presumptions arising out of other facts favoring the claimant and has found that an employe was killed in a particular manner, such findings cannot properly be held to be without support upon the record.

In an administration of the legislation providing for those suffering from the results of industrial accidents, the appellate courts have been liberal in the admission of evidence and in permitting inferences to be drawn from established facts. This is peculiarly so with reference to accidents that have resulted in death where an eye witness was not present. Resort, however, to evidence not ordinarily received or the adoption of inferences that do not clearly follow is to be limited by the circumstances of the particular case and is not allowed to overcome direct proof or to lead to results that do not provide exact justice. It is significant that, in the various statements that have been made by the appellate courts with relation to the presumptions to be drawn from the finding of a body when no one was present at the death, they are qualified by such statements as those found in the Flucker case that the inference of accidental death may be drawn ''where no facts appear indicating anything to

the contrary," or "in the absence of evidence to the contrary."

The weakness of the claimant's case is that when we accept all of the facts favorable to her and draw all reasonable inferences in her favor, we are still in a situation where it is a mere guess or conjecture as to whether the decedent died from drowning or apoplexy. Stauffer was not in robust health. Expert evidence was not furnished by claimant as to the cause of death, from which we may assume that claimant was unable to produce any such evidence. One would, under ordinary circumstances, not drown in ten or twelve inches of water. The claimant, although given a second opportunity to present additional evidence, failed to show by those knowing the facts all the material circumstances, but relied upon inferences drawn from a few meagre facts and that, too, without giving the fact finding body the benefit of expert advice. She could not by so doing take advantage of rules adopted by reason of necessity and thereby exclude from consideration the attendant circumstances. However, she did by her own testimony show that the decedent was suffering from high blood pressure and on that account had been given light work.

Even though the evidence be considered in a light most favorable to the claimant and all inferences drawn in her favor, there are two possible causes of death with no expression of opinion from an expert as to which is even the more probable. "It is not enough for plaintiffs to show the injury complained of was due to one of two or more possible causes if defendant was responsible for but one of them. They must go further and show the latter cause was the proximate one from which the injury followed as the natural and probable result": Bruggeman v. York, 254 Pa. 430, 435, 98 A. 970. Also, see Miller v. Director General of Railroads, 270 Pa. 330, 113 A. 373. If death

was due to apoplexy in the ordinary progress of that disease, the defendant was not responsible to the claimant. To hold the defendant here responsible it is necessary to resort to a mere guess or conjecture as to the cause of death. This is not permitted. The claimant failed to sustain the burden of proof imposed upon her and the judgment must be affirmed.

Judgment of the court below is affirmed.

DISSENTING OPINION BY KELLER, J.

I would reverse the judgment and reinstate the award of the board.

The evidence shows that the company's physician, Dr. Cook, who testified at the hearing that, in his opinion, Stauffer's death was due to apoplexy, on July 20, 1929, four days after the death, prepared, in his own handwriting, and swore to, a proof of death for the Metropolitan Life Insurance Company in which he stated that the cause of death was 'drowning,' and that it was 'accidental.' At the hearing, Dr. Cook gave no explanation of this affidavit, which was offered and received in evidence on behalf of the claimant.

This evidence, together with the testimony of the undertaker that when he embalmed the body air bubbles were coming from the deceased's nostrils, and water, or a liquid like it, continued to run from his mouth and nose,—which are well known indications of death by drowning, but not of apoplexy—and that to overcome this he had used a trocar and extracted between a quart and a half and two quarts of mixed fluid or liquid, with a little blood in it, was sufficient, in my opinion, to support the board's finding of fact of accidental drowning; and if so, neither the court below nor this court can legally disturb it.