Ewing *v.* Alan Wood Steel Company, Appellant.

Argued December 18, 1939.

Before KELLER, P. J., CUNNING-
HAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT,
JJ.

*James Herbert Egan,* for appellant.

*Harry M. Sablosky,* with him *Maxwell Strawbridge,* for appellee.

OPINION BY PARKER, J., January 30, 1940:

The only question raised in this appeal of a workmen's compensation case is whether the claimant's husband was in the course of his employment with defendant when he met with a fatal accident. The referee found that he was and awarded compensation. The board affirmed that award and, on appeal to a court of common pleas, judgment was entered for the claimant. We are of the opinion that the judgment must be reversed on the ground that there was not sufficient evidence to support the award.

William Ewing, on November 20, 1937, then 68 years of age, was in the employ of the defendant as a night watchman and had been so employed for at least eight years. Prior to that time he had experience as a municipal policeman and enjoyed a reputation for courage in the performance of his duties. He was one of twenty-six persons employed as watchmen and policemen to guard defendant's large manufacturing plant, which extended for a distance of several miles along a river with a five-story office building at one end. Ewing reported for duty as usual at 4 P. M., and his shift was to continue until midnight. The decedent and a number of other employees were sworn in as night watchmen by the Court of Quarter Sessions of Montgomery County and were authorized by that order to carry guns and make arrests. However, Ewing's superior had forbidden him to carry a gun. It was the duty of Ewing to watch the office building and his superior officer instructed him that at no time, under any circumstances,

was he to leave that building but that in case of emergency he should use a telephone located in the office building and call the chief or other policemen employed by the company or the public authorities. The decedent was instructed to light a lamp near a bridge on his way to work at four o'clock. The lamp and a stone quarry hereafter mentioned were in opposite directions from the office building. The normal procedure for Ewing was to enter the building and, after the clerks left, lock the doors on the inside and remain until he was relieved at midnight by another watchman.

Shortly prior to midnight the decedent's wife and son called at the plant with an automobile for the purpose of taking him to his home, but the decedent failed to respond to signals to open the door and other watchmen were summoned. It was necessary to break into the office building and when this was done Ewing could not be found, although the search was continued until daylight. On entering the building they found decedent's lunch bag containing one of two sandwiches he had taken with him that day and some fruit. Nearby on a desk were decedent's false teeth, containing particles of food, which suggested that he had started to eat his lunch. On the desk were his reading glasses, an open newspaper, a package of tobacco, and his watchman's clock. A watchman's clock indicated that he had been on the premises until after 6:45 P. M., but he had not subsequently operated a time clock and there was no evidence that he had called the headquarters of the police department. Normally he would have punched the time clock again at 9 P. M.

Early on the morning of November 22, the dead body of Ewing was found at the bottom of a quarry on real estate owned by the defendant, the nearest point of which property was at least 800 feet from the office building. The body was discovered by a hunter at the foot of a high cliff overlooking the quarry. Foot tracks at the summit, the location of a pair of glasses which

he wore continuously and his flashlight, as well as a disturbance of the ground in the vicinity, led the referee to find, and we think properly, that decedent had fallen from the cliff a distance of 85 feet into a rocky formation and as a result was killed. An autopsy was held and the physician in charge testified that there was a laceration in the scalp and on the left side of the bridge of the nose; that there was a large contused area on his back and bruises covering the entire backs of both hands; that the left hip and the right wrist were dislocated and there were lacerations at the tip of the right index finger; that there were complete fractures of seven ribs on the right side of the breast bone, the left clavicle, and the first three ribs on the left side. The decedent had on his person when found $250 in cash.

On the inside of the window of the office building near the bench where the decedent had apparently been sitting, moisture had been rubbed from the glass at a distance from the floor corresponding with the decedent's head, from which the inference was drawn that the decedent had been looking out of that window recently, and the further inference that there was something on the outside which attracted his attention. There had been some thievery of scrap iron from other parts of the mill located some distance from the office building and other officers were investigating that circumstance.

The stone quarry, while owned by the defendant, was not then used in connection with the operation of its plant or for any other purpose, the evidence being that it had been purchased solely for the reason that blasting operations which had been carried on there had annoyed the employees located in the office building. It was separated from the other grounds of the defendant used in its operations by a dense undergrowth.

The burden of proof rested on claimant to show by a preponderance of the evidence all the elements necessary to support an award: *Condron v. Phila. & Reading C. & I. Co.*, 78 Pa. Superior Ct. 133, 139; *Stauffer v. Susq.*

*Col. Co.,* 116 Pa. Superior Ct. 277, 280, 176 A. 740; but the burden of proving exceptions, or an affirmative defense, rested on the one interposing such a defense: *Keyes v. N. Y., Ontario & W. Ry. Co.,* 265 Pa. 105, 107, 108 A. 406. It is also provided by section 301 of the Workmen's Compensation Act of June 2, 1915, P. L. 736, as amended (77 PS §431), that the burden of proving self-inflicted injuries is on the employer. Such burden is not sustained in any case by evidence that warrants nothing more than a guess or a conjecture. The immediate question therefore is whether there is in this record evidence which, if believed, will justify men of ordinary reason and fairness in affirming the proposition that Ewing met his death while in the course of his employment with the defendant: 5 Wigmore on Evidence §2494, p. 459.

*"Where no facts appear indicating anything to the contrary,* it may be presumed logically that an employee at his regular place of service, during his usual working hours, is there in discharge of some duty incident to his employment; and, when the dead body of an employee is found on the premises of his employer, at or near his regular place of service, under circumstances fairly indicating an accidental death which probably occurred during the usual working hours of the deceased, the inference may fairly be drawn, *in the absence of evidence to the contrary,* that the employee was injured in the course of his employment" (Italics supplied): *Flucker v. Carnegie Steel Co.,* 263 Pa. 113, 119, 106 A. 192; *Dannals v. Sylvania Township,* 255 Pa. 156, 99 A. 475. This case is distinguished from the Flucker case by the facts that the body of Ewing was not found at or near his regular place of service or at a place used by defendant in its manufacturing operations.

The phrases "defendant's premises" and "defendant's property" as used in compensation cases are not synonymous. The content of the word "property" is larger

than that of "premises" when employed in that connection: *Boscola v. Penna. C. & C. Co.,* 90 Pa. Superior Ct. 456, 459; *Molek v. W. J. Rainey, Inc.,* 120 Pa. Superior Ct. 95, 181 A. 841. "Premises" are that part of the employer's property used in connection with the actual place of work where the employer carries on the business in which the employee is engaged: *Tolen v. P. & R. C. & I. Co.,* 270 Pa. 12, 113 A. 67. "To be considered as happening on the 'premises' of the employer the accident must have occurred on property owned, leased or controlled by the employer and so connected with the business in which the employee is engaged, as to form a component or integral part of it": *Feeney v. N. Snellenburg & Co.,* 103 Pa. Superior Ct. 284, 287, 157 A. 379.

The body of Ewing was not found at "his regular place of service" for his duties as prescribed by his superior were confined to the interior of the office building. He was directed not to leave the building; he was not permitted to carry a gun and did not do so; and he was directed that in the event anything occurred on the outside he was to call the office or police headquarters. The body was found not only outside of the building but more than 800 feet from the building and at a place where no part of the employer's business was performed. In fact, it was necessary to go through a dense undergrowth to an abandoned quarry to reach that point.

While the body was found on land owned by the defendant it was not in a place where the employer carried on the business in which Ewing was engaged or where the employer carried on any business. The office building was located at the end of the employer's large manufacturing yards, the plant being located in the opposite direction from the stone quarry. In short, there is not an item of evidence on which to predicate a finding that the stone quarry was part of the defendant's premises. It follows that if the claimant is en-

titled to recover anything it must be because Ewing "was actually engaged in the furtherance of the employer's business at the time of the accident." The statute so provides and "actual" means "as an existing fact"; and the word "actual" is used as "opposed to constructive": *Maguire v. James Lees & Sons Co.,* 273 Pa. 85, 88, 116 A. 679.

There is not any direct evidence showing what Ewing was doing after he left the office building some time between 7 and 9 P. M. of November 20 and the time he met with his accident, or as to what his purpose or aim was in departing from his usual place of employment, further than that he probably fell over a cliff and was as a result so severely injured that he died. It does not appear how long he was dead before his body was discovered. There is some speculation as to his movements by claimant and defendant. The claimant suggests that Ewing may have been pursuing a trespasser or felon, while defendant suggests that he may have committed suicide. While there was some evidence, contradicted in part, to the effect that Ewing was expecting to undergo a second operation for the removal of a cataract from his eye and that he had asked to be retired but was not eligible for a pension, this evidence was not of sufficient weight, if accepted in its entirety, to sustain an affirmative defense of suicide. At the same time the evidence in support of the claim that defendant was pursuing a criminal, as we shall see, was of just about the same weight. The burden remained on claimant to make out every element essential to recovery by a preponderance of the evidence.

Is the evidence sufficient to support a finding that Ewing was *actually* engaged in the promotion of the employer's business when he met with his accident? Will it support a finding that Ewing was pursuing a criminal or trespasser? Ewing may have been killed either before his shift ended at midnight or at any time within twelve or more hours thereafter. There is no

evidence that there was any trespasser in or around the office building. There was some evidence that scrap had been stolen at another time and at another place in the plant which extended over several miles, but it was not Ewing's duty to guard other parts of the plant. He was directed not to leave the building and the company employed twenty-six watchmen and policemen who had duties to perform. Valuable records and property were in the office building which it was Ewing's duty to guard and he had been instructed to give his exclusive attention to such service. If we were to sustain the findings of referee and board it must be inferred that a trusted watchman disobeyed positive orders to the contrary, left the building unguarded without telephoning any one of several places designated to which he should report suspicious circumstances, and on a dark night, when 68 years of age, went through a thicket with a flashlight in pursuit of a trespasser, or perhaps a felon. We must infer that without a gun he was pursuing a trespasser. While the factum probandum may be made out by circumstantial evidence, such evidence as we have in this record is only sufficient to support a mere guess or conjecture and that is not enough.

If there were any evidence that there was at the time a trespasser about the office building and Ewing, even in disobedience of his orders, pursued such trespasser, a situation more favorable to the claimant would be presented and it might be argued that in so doing he was performing an act so closely related to the business with which he was charged that even though he was negligent in so acting or even acted contrary to orders, it could not be said that he had departed from the course of his employment. The weakness in claimant's proofs is that there is no evidence that will support a conclusion that there was any trespasser to pursue or that he was in fact pursuing a trespasser, felon, or other criminal. The claimant failed to support the

burden imposed on her and the judgment must be reversed.

Judgment reversed and here entered for defendant.