## Mackey v. Swift & Co.

*Bertha Mackey*, plaintiff, p. p.

*John J. McCamley* and *Charles H. Davison*, for defendant.

DePuy, P. J., May 16, 1957.—This case arises under The Pennsylvania Occupational Disease Act of June 21, 1939, P. L. 566, (hereinafter referred to as the act) on appeal from the order of the workmen's compensation board (hereinafter referred to as the board) by the employer and the employer's insurance carrier.

The referee who heard the case filed an award on June 8, 1956, giving Bertha Mackey, claimant, on the basis of total disability, the sum of $29.33 per week from January 18, 1955, to February 22, 1955, the termination date, a period of five weeks, or a total of $146.65, with interest, and providing that medical

expenses incurred by claimant should be paid by the carrier within the statutory period.

This award was appealed by defendant to the board and on November 13, 1956, the latter made an order affirming the referee's findings of fact, conclusions of law and award of compensation.

On January 11, 1957, defendant filed, in the Court of Common Pleas of Franklin County, exceptions to the determination of the board. Defendant challenged the seventh and eighth findings of fact of the referee, his second conclusion of law and the finding of the board that claimant's dermatitis is an occupational disease peculiar to the chicken industry or is an occupational disease within The Pennsylvania Workmen's Compensation Act, and to the failure of the board to make any finding which would credit against the award the unemployment compensation benefits which claimant had received during the period of disability.

Claimant, Bertha Mackey, was employed by Swift and Company at their Chambersburg plant for a total of 29 months. Her employment first began on December 31, 1951, and terminated January 10, 1955, and there were several intervals during that period when she was not working for defendant, due to pregnancy or otherwise. During the last period of her employment her duties were as a steamer, namely to arrange the chickens on a conveyor so they could be steamed; her earlier employment had been that of a pinner where, after the chickens had passed through a scalding tank of water at a temperature of about 127 degrees and a mechanical picking device, she would have to finish cleaning the chickens of pin feathers, etc., as they passed her on a conveyor.

While claimant was working at defendant's plant as a pinner in November, 1953, she first noticed a breaking out of her hands, immediately reported this to her superior and was directed to the company

doctor, Dr. Theodore Peters, who treated her for a week or two, not very successfully, according to her statement. In September, 1952, she was off work because of pregnancy, returning to work May 1, 1953.

When claimant's condition did not clear up after her treatment by Dr. Peters, the company directed her to Dr. Louis C. Gordon on December 20, 1953, and he treated her eight times for dermatitis of the right hand. In January, 1954, he sent her to Dr. George Jennings, a skin specialist, in Hagerstown, Md., whom she visited three times lasting until April, 1954. He never considered her cured altogether.

Dr. Jennings stated there were 300 different types of dermatitis. He advised claimant that he did not find her allergic to chickens. He advised Dr. Gordon in a report dated March 20, 1954, that claimant had a dermatitis due either to sensitivity to chickens or to a solution used while working on the chickens. He told her that it was a fungus infection. Dr. Jennings informed claimant that the ailment could come from a solution that she was in contact with at her employment. He gave her the chicken test and it proved negative, she stated.

Claimant told Dr. Jennings and the referee that she knew of no chemical that was placed in the water used for preparation of the chickens. Dr. Jennings had asked claimant to obtain a small quantity of whatever solution was used in the water while cleaning chickens at the plant. The plant claimed they did not use anything but tap water. She did not furnish to the doctor any sample of a solution or any sample of the water that she was working in around the chickens. Claimant at one time noticed two tanks in the plant marked "chlorine" but she had no information that the chlorine or any other substance was used in the water in which she worked.

After leaving Dr. Jennings in the spring of 1954 until November, 1954, claimant did not see any physician. In late 1954 she again saw Dr. Gordon. She returned to work January 2, 1955. The company finally asked her to stop working on January 10, 1955, because of the dermatitis, and she did so, the union having joined in the discussions. During claimant's final period of work with the company, she worked at the steaming machine. She wore rubber gloves but the water would get inside the gloves. Sometimes the gloves would have holes in them. Claimant's hands were broken out when she left work January 10th, and were still sore. Dr. Gordon treated her until they cleared up about six weeks later and she had no further trouble until mid-July, 1955, some six months after her final work at Swift and Company, when, as she stated: "They broke out but right".

She then caused Dr. Gordon P. VanBuskirk to examine and treat her hands which he did for a period of five months. He examined and treated her for dermatitis while he was coming to her home to treat her husband who had been hurt in an accident.

At the time of hearing on April 6, 1956, claimant noticed a little itching and irritation from time to time.

The dermatitis seemed to be static, she having last seen a physician, Dr. VanBuskirk, in December, 1955. In order to keep the malady from recurring, it appears claimant was advised to keep the hands dry, and in event she must be around water or moisture, she must put on white cotton gloves followed by rubber gloves, which she considers a great inconvenience. If there is a recurrence of the breaking out of the hands, she is to use a certain salve.

The characteristics of plaintiff's ailment were that at first she noticed an itching and later it was like

little pinpoints underneath the skin which afterwards would raise into blisters which would break and get raw and sore. At first this occurred on her hands. The last time, in the summer of 1955, it was on her head and various parts of the body, but most of it on her hands. Dr. Gordon noted the ailment on both hands, her scalp, right side of the nose and in the left arm pit.

The medical testimony was that claimant's ailment, as observed by Dr. VanBuskirk in July, 1955, consisted primarily of a reddened and scaly condition of the fingers, especially at the finger tips, and some cracking of the tips which he diagnosed as a dermatitis of the hands. He stated that dermatitis is generally caused by some irritant and the remedy is generally in the form of a lotion or cream that will soften the skin, plus using cotton gloves to absorb perspiration and then rubber gloves. The malady is characterized first by an itching which results in scratching by most persons and then the worsening of the condition because of the scratching.

Claimant, as a housewife, before January 10, 1955, and afterwards, pursued her ordinary duties as such and knew of nothing she did that would cause her to have trouble with her hands. She did not have any activity at home with chickens or other fowl, and she did the normal amount of washing dishes around the home.

Mrs. Mackey drew unemployment compensation after she was laid off in January, 1955, until the compensation was exhausted. Her wages at work were $1.02½ per hour, plus incentive bonus and she earned between $36 and $44 a week. She lost 12 weeks work because of the ailment, for which she received unemployment compensation.

The medical testimony showed that dermatitis is a term applied to a great number of disease manifesta-

tions and that it is general among the population, rather than being peculiar to any industry or, at least, to the chicken industry. Dr. VanBuskirk, as well as Dr. Gordon previously, said he could not determine what the irritant was in this case. Dr. Gordon stated when he treated claimant in 1953 and 1954, he *thought* she got the dermatitis *while* she was at work. With regard to his examination of her in September, 1955, Dr. Gordon said he would not say one way or the other that this condition was due to her work at Swift and Company as he didn't know what she had been doing from the time she left the company in January until September and that it is possible for a housewife to contract dermatitis from ordinary household duties.

Several employes and Dr. Gordon testified that there were quite a few cases of dermatitis occurring at the Swift plant from time to time, on the part of different employes. At a time subsequent to the occurrences forming the subject of the present claim, the union and the company agreed that a solution should be used at the plant in order to reduce the condition of sore fingers and hands and as a result a reduction of perhaps 50 percent in the incidence of this ailment has occurred.

The law concerning compensation for disability due to an occupational disease is set forth in section 108 of The Pennsylvania Occupational Disease Act of June 21, 1939, P. L. 566, as amended, 77 PS §1208(*i*), as follows:

"The term 'occupational disease,' as used in this act, shall mean only the following diseases: . . .

"(*i*) Infection or inflammation of the skin due to oils, cutting compounds, lubricants, dust, liquids, fumes, gases, or vapor, in any occupation involving direct contact with, handling thereof, or exposure thereto."

Section 301 of the act, 77 PS §1401, is as follows:

"(c) Compensation for the occupational diseases enumerated in this act shall be paid only when such occupational disease is peculiar to the occupation or industry in which the employe was engaged, and not common to the general population. . .

"(f) If it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, it shall be presumed that the employe's occupational disease arose out of and in the course of his employment, but this presumption shall not be conclusive."

To sustain her claim, claimant must show by competent evidence the following elements: 1. That there is an occupational disease known as dermatitis, and peculiar to the chicken industry; 2. that claimant at the time of employment involved was suffering from such disease; 3. that claimant contracted this disease during and because of her employment by defendant employer in the chicken industry; 4. that claimant was disabled by this disease during the period claimed for.

If and after claimant can establish by proper proof the first element, that there is an occupational disease, known as dermatitis, peculiar to the chicken industry, then her cause is aided by the statutory presumption above quoted, which is rebuttable: Jaloneck v. Jarecki Mfg. Co., 157 Pa. Superior Ct. 609; 43 A 2d 430.

During our examination of the evidence and of the law in this case, we are mindful of the maxim, "Hard cases make bad law". Claimant is a housewife with six children and has, it seems clear, suffered injury. But we cannot in obedience to our oath afford her relief unless her case comes within the limitations prescribed by law. The sum of money involved, although impor-

tant to her, is not large. But the principle involved, so far as industry generally and the rule of law are concerned, may be very important and should be correctly ascertained and applied.

As stated by our Supreme Court in McIntyre v. Lavino & Co., 344 Pa. 163, at 165:

"Occupational diseases are, from a legal standpoint, peculiar in this—that they arise, not from an accident or event happening at a precise moment, but from a day by day exposure to unhealthful conditions over an extended period; the exact time of their origin is necessarily obscure and their insidious progress is not revealed until, frequently after a long interval, the disability which they create manifests itself."

In Wright v. Juris Apparel, Inc., 62 Dauph. 110, at page 118, the court correctly stated:

"The humane purposes of the compensation laws require that The Occupational Disease Act receive a liberal construction in order to accomplish the full purpose of this beneficial legislation. However, giving due consideration to the requirements of such liberality, we cannot approve an award of compensation where the proofs do not meet the essential requisites of the Act."

Claimant's position having been sustained by the referee and the board, we are limited, in the appeal, to examining the record and determining whether there is "sufficient competent evidence" to support the findings and conclusions of the finders of fact.

The burden and quantity of proof as laid down by the decided cases is on plaintiff to show, by a preponderance of the evidence, all the elements necessary to support an award: Ewing v. Alan Wood Steel Co., 138 Pa. Superior Ct. 519; Kirby v. Carnegie-Illinois Steel Corp., 145 Pa. Superior Ct. 121; Connelly v. Bachman, 155 Pa. Superior Ct. 372.

To sustain claimant's effort the burden is on her to prove, by a fair preponderance of the competent evidence, that the malady from which she suffered came from the source alleged by her, namely the premises of the employer during the time of her employment: Troxell v. Shirk, 130 Pa. Superior Ct. 40.

If the ailment that disabled claimant was caused by one of the types of hazard enumerated in the statute as first above quoted, and the disease was peculiar to the chicken occupation or industry, and was contracted by claimant from her employment there, then we are dealing with an occupational disease and a claim covered by the statute. Since chickens or animals are not mentioned in the enumeration, then the chicken could not be the source of any injury that would result in liability under this statute, and to that extent one of the statements in the opinion of the board that is before us would be weakened. The only part of the statutory definition that could be the basis for finding an occupational disease present in this case is the word "liquids", unless vapors be included. The only liquid involved, according to a fair review of the evidence, is water. However, the water involved certainly is not spring water in its pristine purity. From the cleaning of great numbers of chickens coming to the plant from every sort of surroundings, it is more than probable that foreign matter and germs of all varieties would by solution or suspension become present in this water. The resulting liquid in which employes worked may have been "tap water" at the beginning, but could hardly be called that at the end.

The difficulty for claimant, as we see it, is that there has been no adequate or scientific showing in the evidence that plaintiff's ailment comes from any particular or specific source in the liquid, or elsewhere. At least two essential steps in claimant's proof of dis-

ability are absent: (1) Pinpointing and analysis of the harmful substance, whatever it was; (2) proof of the causal relation between such substance and claimant's malady. Had claimant taken to Dr. Jennings, or elsewhere, a sample of the dirty water with which she worked about the chickens and had it analyzed, she may possibly have found the answer, or have been on the track toward finding it.

We are not permitted to guess or speculate on what the causal factors are: Fitzgerald v. Atlas Asbestos Company, 158 Pa. Superior Ct. 151; 44 A. 2d 316; Kasecky v. Pittsburgh Coal Co., 27 Wash. Co. 25. These must, in a situation susceptible of scientific knowledge, be established by the greater weight of competent, scientific evidence. The overall burden of proof was on claimant. We would be flying in the face of modern knowledge, law and reasonable standards of proof and would be helping to make resort to the courts a lottery rather than an appeal to reason and law, were we to determine a question of this kind which is outside the scope of ordinary human knowledge on the basis of supposition, rather than upon the best scientific knowledge reasonably available.

A reading of the evidence discloses that the testimony that could be considered competent, that is medical or pathological testimony, tending to prove the exact nature of claimant's malady and the specific manner in which this malady may have been present in the work claimant was doing at the Swift plant and tending to establish a causal connection between the work and claimant's malady, is elusive in the extreme. Searching for any testimony tending to establish causal connection that would support the findings of the referee and the board, which findings we are bound to respect if they are based upon any creditable

testimony, we find nothing more convincing than the following items.

Dr. VanBuskirk was asked his professional opinion as to what caused the dermatitis of claimant. He answered: "That is the difficulty. It is a dermatitis of the hands. In the experience that we see in every-day practice, it is generally caused by some irritant and you try to get some form of lotion or cream that will soften that . . . ". On cross-examination of the doctor, the following colloquy occurred:

"Q. I believe you stated that she had a dermatitis of both hands which was caused by some unknown irritant?

"A. That is right.

"Q. In other words, you have cases of dermatitis generally. Is that right? It is something that is not peculiar to any particular industry, but is general among the population?

"A. That is right."

Dr. Gordon was asked if he was able to localize the irritant causing claimant's dermatitis. He answered: "No, I was not". Then he was asked: "What do you feel might be causing it?" His several answers were: "Well, I was suspicious that it was due to contact with chickens and due to her hands being wet . . ." and "It can be caused by any number of things depending upon the individual and the exposure".

After Dr. Gordon referred claimant to a dermatologist, Dr. Jennings, who did not testify, the latter reported to Dr. Gordon that "she had a dermatitis due either to sensitivity to chickens or to a solution used at work on the chickens". This answer in the alternative, it being conceded that the doctor never examined any solution used in and about the chickens, and admitting that claimant's illness could be due to her own sensitivity, although the doctor elsewhere stated that

she had no allergy to chickens, does not in our opinion rise to the dignity required where a professional opinion of a scientist or expert is called for.

Dr. Gordon was asked whether, in his opinion, claimant contracted dermatitis at Swift and Company. He stated he could not answer yes or no so far as his examination in September 1955, was concerned, eight months after she ended her employment. Then the following colloquy occurred (Italics Supplied) :

"Q. When you treated her back in 1953 and 1954 was it your opinion that it was being caused by something at work?

"A. I *think* she contracted it *while* she was at work, yes.

"Q. Did you feel that in your opinion that it was the conditions at Swift and Company that caused her condition as you examined her in September 1955?

"A. Well, as I say, I can't answer that yes or no, it could be and it could not be."

In our opinion the doctor's statement that he *thinks* she contracted the malady is a weak statement and when coupled with the phrase *"while* she was at work" we feel the language is too vague to establish a causal connection. The word "while" refers to time and means "during the time that; as long as", and could refer to contracting an ailment outside working hours or from a variety of causes not specifically attributable to her employment. There is no showing of any scientific evidence that would pin the ailment to any phase of work at Swift. The doctor answered several related questions as follows:

"Q. Is it possible to get dermatitis from just ordinary every-day taking care of a house?

"A. Yes.

"Q. Is it not peculiar to a poultry industry?

"A. No.

"Q. It is a hazard that anybody anywhere could be subjected to?"

"A. Dermatitis is, yes.

"Q. To your knowledge, do you know of any solutions, fluids or irritants of any kind used in the so-called assembly line of chickens?

"No. I don't."

Not only, as we see it, has claimant not succeeded in adducing proof of the required standard that her ailment is caused by liquids at the Swift plant, but she has not shown that dermatitis is an occupational disease peculiar to the chicken industry or occupation and not common to the general population.

The word "industry" surely embraces the chicken processing business throughout a large area in State or nation. The word "occupation" has, we think, neither a broader nor narrower significance. Still, we consider that either word, as used in the statute, extends beyond the one plant in Chambersburg. The testimony in the record does not establish that there is such a disease characteristic of the chicken processing industry or occupation. It seems to us that effective testimony on this topic would have to be by scientific or industrial authority, or statistical proof from an adequate area. Actually, the record does not show clear cut evidence of the requisite standard tending to establish an occupational disease hazard if the question were limited to conditions at this particular Swift plant nor any reasonably accurate showing of the actual number or percentage of Swift employes, if any, who contracted this particular malady at the plant.

The act recognizes that it may be unreasonably difficult for the individual employe to show that his particular place of employment was so conducted as to present an occupational disease hazard. Therefore, the act provides that if the occupation or industry in which

he is employed is one in which the occupational disease from which he suffers is a hazard, it shall be presumed (but not conclusively) that his disease arose from his employment: Metz v. Quakertown Stove Works, 156 Pa. Superior Ct. 70. In the present case the rebuttable presumption never arose because there was never "sufficient competent evidence" produced to establish the hazard of dermatitis as existing in the poultry processing industry or occupation.

Defendant contends further against payment of the present claim on the ground that claimant received unemployment compensation benefits during the time when the referee found her disabled. Defendant asserts that under The Pennsylvania Occupational Disease Act, 77 PS §1304, such unemployment compensation payments must be credited against the amount of the award here. That is correct.

Accordingly, we find that of the exceptions taken by defendant and the insurance carrier to the findings and conclusions of the referee as affirmed by the workmen's compensation board, all the exceptions numbered from one to seven are sustained, with the exception of number two, which refers to the eighth finding of fact, namely that claimant was totally disabled from January 11, 1955, to February 25, 1955. The latter exception is overruled and the referee's eighth finding of fact is confirmed.

Although defendant argues that this court should rule finally against claimant's cause, we cannot foreclose the further right of claimant, if she can do so, to produce evidence of the kind and quality that is required to support her allegations.

Now, May 16, 1957, the order of the workmen's compensation board is reversed and the record is remitted to the board for further hearing, consideration and determination in the light of this opinion.