469 A.2d 585

**Marcelino GARCIA, Father of Joseph R. Garcia, Deceased, Appellant,**

**v.**

**WORKMEN'S COMPENSATION APPEAL BOARD and (BETHLEHEM STEEL CORPORATION), Appellees.**

Supreme Court of Pennsylvania.

Argued Oct. 24, 1983.

Decided Dec. 30, 1983.

Reargument Denied Feb. 23, 1984.

Richard J. Orloski, Allentown, for appellant.

Michael Shay, Bethlehem, for appellees.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHER-TY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

*Opinion of the Court*

HUTCHINSON, Justice.

The estate of claimant Marcelino Garcia appealed to this Court from a February 26, 1982 Commonwealth Court order reversing a November 16, 1982 order of the Workmen's Compensation Appeal Board. The Board had set aside a November 7, 1977 referee's decision which had dismissed claimant's fatal claim petition on the basis that the death of the claimant's son was intentionally self-inflicted. Because the Board erred in substituting its own resolution of the competing inferences from the evidence in this case to find an ultimate fact contrary to the factfinding of the referee, the only legitimate factfinder, *see Page's Department Store v. Velardi,* 464 Pa. 276, 282, 346 A.2d 556, 559 (1975); *Universal Cyclops Steel Corp. v. Workmen's Compensation Appeal Board,* 9 Pa. Commonwealth Ct. 176, 182, 305 A.2d 757, 761 (1973), we affirm Commonwealth Court.

Mr. Marcelino Garcia, the father of the decedent, filed a fatal claim petition with the Bureau of Workmen's Compensation.[1] The claimant lived at his home with Joseph Garcia and claimed benefits as a dependent of his son. Bethlehem

---

1. Marcelino Garcia died April 1, 1977 at the age of 83. His estate now prosecutes this appeal.

denied liability for compensation on its assertion that the decedent's death was "the result of a voluntary leap from a building." The referee dismissed the fatal claim petition, concluding that claimant was partially dependent on the decedent but that decedent's injury was "intentionally self-inflicted, within the meaning of Section 301(a) of the [Workman's Compensation] Act. . . ." 77 P.S. § 431 (Supp.1982–83). The referee found:

[T]hat the decedent, through voluntary act, purposely and intentionally jumped or fell from the south window of the small bag house, thereby sustaining fatal injuries, based on the following facts . . .:

(a) Decedent's work station was not in the small bag house and decedent had no occupational reason to be in said location on June 22, 1975,

(b) Claimant's manner and attitude was different in the month next preceding his death in that he was unusually quiet,

(c) On June 22, 1975, shortly before his fall, decedent's skin coloration was pale and he appeared to be short of breath,

(d) Decedent climbed a railing 42 inches in height and crossed over an opening or a gap 27 inches in width and approximately 13 feet in depth to reach the south windowsill of the small bag house, a condition precedent making it extremely improbable for the decedent to have accidentally fallen from said windowsill,

(e) Decedent's apparent downward exit being head first,

(f) Decedent's helmet and gloves being dropped or thrown from said small bag house window prior to decedent's fall,

(g) Decedent's pre-existing deteriorating physical condition, and

(h) No evidence of negligent or criminal activity by another or others to cause said incident.

 Where the defense interposed by an employer to a compensation claim is that the employee committed suicide

"the burden of proof of such fact shall be upon the employer." *Wellinger v. Brackenridge Borough*, 149 Pa.Superior Ct. 394, 395, 27 A.2d 716, 717 (1942). This is simply a recognition of the legal "presumption" against suicide. *Id.*, 149 Pa.Superior Ct. at 395, 27 A.2d at 717. As Judge Craig correctly stated in the Commonwealth Court's opinion in this case:

> To rebut the presumption against suicide, the employer must demonstrate by a preponderance of the evidence that death was intentionally self-inflicted. *Wellinger v. Brackenridge Borough*, 149 Pa.Superior Ct. 394, 27 A.2d 716 (1942); *Ewing v. Alan Wood Steel Co.*, 138 Pa.Superior Ct. 519, 12 A.2d 121 (1940).
>
> Here, the referee formally concluded that the proofs more than met that standard; he held that "[d]efendant proved by clear and convincing evidence that decedent's injury and resulting death on 6/22/75 was intentionally self-inflicted within the meaning of Section 301(a) of the Act."
>
> . . . .
>
> Where the facts permit an inference of accidental death as well as an inference of suicide, the choice between those inferences is for the factfinder and not for the reviewing authority. *Rittenberg v. Abbott Laboratories*, 158 Pa.Superior Ct. 400, 45 A.2d 400 (1946); *Hunter v. American Oil*, 136 Pa.Superior Ct. 563, 7 A.2d 479 (1939). The referee's findings based on such an inference must be sustained unless "the evidence to the contrary is so clear, positive and credible and either uncontradicted or so indisputable in weight and amount as to justify" setting aside the decision. *Brecker v. Philadelphia & Reading Coal and Iron Co.*, 138 Pa.Superior Ct. 421, 424, 10 A.2d 827, 828 (1940).

65 Pa. Commonwealth Ct. 59, 62–63, 441 A.2d 518, 519–20 (1982) (footnotes omitted).

 Simply because the employer had the burden to show suicide, appellate intrusion into the factfinding process is not warranted where there is sufficient competent

evidence to support the referee's finding. There can be no question that such evidence may be circumstantial, as here. Indeed, the referee's underlying findings of the circumstance from which the referee could infer that decedent committed suicide are fully supported by the record.

 The presence or absence of record evidence showing decedent had suicidal tendencies might be proper argument to the referee but it goes only to the weight of the evidence and is thus irrelevant here. The circumstances here show that the referee could properly conclude that the decedent voluntarily jumped out of a window and died from the fall. When the referee found suicide, a finding supported by competent evidence, he converted that likelihood into a factual finding insulated from review by the Compensation Board. *Page's Department Store, supra; Universal Cyclops Steel Corp., supra.* We, therefore, affirm.

LARSEN, J., files a dissenting opinion in which ROBERTS, C.J., and ZAPPALA, J., join.

LARSEN, Justice, dissenting.

I dissent. The majority has permitted the stigma of suicide to attach to the decedent for no reason which is apparent upon the record. In the early evening of June 22, 1975, two men were working in the ore yard adjacent to a building at the Bethlehem Steel Corporation, appellee (hereinafter Bethlehem). At about 5:45 p.m., a hard hat and work gloves hit the ground several feet in front of the two men who immediately looked up and observed a falling object which struck a large gas pipe line, bounced off the line and hit a retaining wall, then finally landed on a scrap pile next to the wall. The object turned out to be Joseph Garcia, the decedent, an employee at Bethlehem, who was pronounced dead at 6:32 p.m. from injuries resulting from the fall.

Mr. Marcelino Garcia, the father of the decedent, filed a fatal claim petition with the Bureau of Workmen's Compen-

sation.[1] The claimant lived at his home with Joseph Garcia and claimed benefits as a dependent of his son. Bethlehem denied liability for compensation on its assertion that the decedent's death was "the result of a voluntary leap from a building."

Numerous hearings (13) were held before Referee Harry C. Shayhorn during a period which extended from December 22, 1975 to June 8, 1977. By opinion of November 4, 1977, the referee dismissed the fatal claim petition, concluding that claimant was partially dependent upon the decedent, but that "decedent's injury and resulting death on 6/22/75 was intentionally self-inflicted, within the meaning of Section 301(a) of the Act ...." 77 P.S. § 431 (supp. 1982–83). The critical finding with regard to the cause of death was as follows:

10. The Referee finds that the decedent, through voluntary act, purposely and intentionally jumped or fell from the south window of the small bag house, thereby sustaining fatal injuries, based on the following facts found by the Referee:

(a) Decedent's work station was not in the small bag house and decedent had no occupational reason to be in said location on June 22, 1975,

(b) Claimant's manner and attitude was different in the month next preceding his death in that he was unusually quiet,

(c) On June 22, 1975, shortly before his fall, decedent's skin coloration was pale and he appeared to be short of breath,

(d) Decedent climbed a railing 42 inches in height and crossed over an opening or a gap 27 inches in width and approximately 13 feet in depth to reach the south windowsill of the small bag house, a condition precedent making it extremely improbable for the decedent to have accidentally fallen from said windowsill,

(e) decedent's apparent downward exit being head first,

1. Marcelino Garcia died on April 1, 1977 at the age of 83. The estate now prosecutes this appeal.

(f) decedent's helmet and gloves being dropped or thrown from said small bag house window prior to decedent's fall,

(g) decedent's preexisting deteriorating physical condition, and

(h) no evidence of negligent or criminal activity by another or others to cause said incident.

Claimant appealed the referee's decision both as to the cause of death as well as to the finding that claimant was only partially dependent. The Workmen's Compensation Appeal Board (hereinafter the Board) affirmed on the finding of partial dependency but reversed the finding and conclusion that decedent's death was voluntary and intentionally self-inflicted. The Board's opinion of November 6, 1980 awarding compensation stated:

In the instant case, the Referee's crucial Finding of Fact No. 10 is based upon eight circumstances of the fatal incident from which the Referee made the "leap" that the Claimant indeed intentionally took his own life. We note, however, that there were other facts present in the record which were not found by the Referee and which would tend to lead a fact finder to come to an opposite conclusion. Some of these facts are that within minutes before his death, the Decedent was inquiring about the availability of soda on the premises; that the maintenance crew had only recently opened the windows in the area where the Decedent fell; that the unindentified footsteps going to the windows could have belonged to persons other than the Decedent; that the Decedent was basically a happy, outgoing, jolly and jovial man; that the Decedent had no suicidal tendencies; and that although the Decedent was suffering from various maladies, none of these were life threatening. *One can only wonder why the Referee failed to mention any of these facts.* There remains to be decided whether or not the eight circumstances listed by the Referee in his tenth factual finding are sufficient, per se, to lead to the inevitable conclusion that the Decedent had indeed committed suicide. We do not believe

such is the case. It has long been held that when the facts and inferences drawn therefrom tend to show several distinct possibilities, including that of suicide for the cause of a decedent's death, the burden of proof, being upon the defendant, has not been met. (emphasis added; citations omitted).

Bethlehem filed a petition for review to the Commonwealth Court which, on February 26, 1982, reversed the Board and reinstated the referee's decision. 65 Pa.Commw. 59, 441 A.2d 518 (1982). That court viewed the Board's decision as infringing on the referee's function as "factfinder and arbiter of credibility", and held that "examination of the record indicates that the referee properly exercised his discretion with respect to the weight, credibility and admissibility of the evidence presented to him." *Id.* 441 A.2d at 520–21. Given that holding, the Commonwealth Court did not address claimant's contention on cross-appeal that he was wholly dependent.

Claimant then petitioned this Court for allowance of appeal and allocatur was granted. I would reverse the Commonwealth Court and reinstate the decision and award of the Board.

Section 301(a) of the Pennsylvania Workmen's Compensation Act (hereinafter the Act), 77 P.S. § 431, provides, in relevant portion:

> Every employer shall be liable for compensation for personal injury to, or for the death of each employe, by an injury in the course of his employment, and such compensation shall be paid in all cases by the employer, without regard to negligence, according to the schedule.... *Provided, That no compensation shall be paid when the injury or death is intentionally self inflicted* or is caused by the employe's violation of law, *but the burden of proof of such fact shall be upon the employer* .... (emphasis added).

Thus the legislature has placed upon the employer the burden of affirmatively demonstrating the defense of intentional self-inflicted injury, or suicide in the case of death.

This legislative allocation of the burden of proof comports with the general common law rule which recognizes a presumption against suicide. *See, e.g. Ford v. A.E. Dick Co.,* 288 Pa. 140, 146, 135 A. 903 (1927). As Dean McCormick has stated:

> When violent death is shown to have occurred and the evidence is not controlling as to whether it was due to suicide or accident, there is a presumption against suicide. Reasons: the general probability in case of a death unexplained, which flows from the human revulsion against suicide, and, probably, a social policy which inclines in case of doubt toward the fruition rather than the frustration of plans for family protection through insurance.

McCormick on Evidence, § 343 (2d ed.)

The employer's burden is a difficult one, commensurate with the strength of the presumption against suicide. This Court discussed the strength of that presumption in *Ford v. A.E. Dick Co., supra.* Though that case is not of recent vintage, the principles enunciated therein have retained their vitality. Where a presumption in favor of a party entitles him to have his case submitted to the triers of fact (such as with the presumption against suicide), "it cannot be withdrawn from them merely because ... other evidence [tends] to rebut that presumption [even though] the evidence to rebut the presumption may be very strong." *Ford v. A.E. Dick Co., supra,* 288 Pa. at 146, 135 A. at 906. This presumption can be overcome only

> "if the evidence relied on by the claimant was one-sided and conclusively showed a self-inflicted injury or suicide.... Here, it cannot be said as a matter of law that the award in [claimant's] favor entirely lacks evidential support; no more can it be held that the evidence relied on by the other side [to rebut the presumption against suicide] is 'so clear, positive, credible, and uncontradicted,' or so 'indisputable in weight' as to justify the court below in holding that the employer had sustained the burden put on it...." *Id.* at 288 Pa. 149–50, 135 A. at 907.

On appellate review, the courts will not ordinarily disturb findings of fact by the compensation authorities unless not "based upon sufficient competent evidence to justify same", 77 P.S. § 834, or unless the fact-finder has capriciously disregarded competent evidence. *Hamilton v. Procon, Inc.*, 434 Pa. 90, 252 A.2d 601 (1969). In the instant case, neither the referee's Fact Finding # 10 ("decedent, through voluntary act, purposely and intentionally jumped or fell ...") nor the conclusion of law based thereon ("3. ... decedent's injury and resulting death on 6/22/75 was intentionally self-inflicted ...") are supported by sufficient competent evidence. The meager factual evidence offered by the employer which permits an inference of intentionally self-inflicted death falls far short of the quantum of proof necessary to rebut the presumption against suicide. The extent of this deficiency becomes even more apparent when viewed in light of uncontradicted, competent evidence on the record supporting the inference of accidental death which evidence, as the Board found, was capriciously disregarded by the referee.

All of the evidence on the intentional versus accidental nature of decedent's fall is circumstantial. Two witnesses, John Nimeh and Charles Palulis, also employees of Bethlehem, observed decedent falling, but did not see the place from which he fell. Obviously, this point was somewhere above the gas pipe lines which the men observed decedent strike as he fell. Above these gas lines were several thick power cables which decedent apparently hit (Notes of Testimony (N.T.) March 15, 1977 at 56–59, 75) and, from the exhibits and testimony of Bethlehem investigators, six or seven places which were initially considered possible building exit points. These investigators were of the opinion that decedent had fallen from the uppermost window of the building in the "small bag room" and, further, concluded that because of the physical characteristics of the window and surrounding area (*see* Fact Finding 10(d)), a person falling from this window would had to have voluntarily jumped through it. The referee accepted that conclusion.

However, a thorough review of the extensive record in this case reveals almost no factual predicate for this conclusion or for the suicide hypothesis.

First, there is not the slightest hint on the record that decedent had suicidal tendencies, or that he had been depressed, despondent, morose or otherwise exhibited any mental abnormalities. The referee seemed to be impressed by testimony that decedent had some health problems and that he had been "unusually quiet" for about a month.[2] *That* is the totality of the evidence regarding decedent's state of mind that could *possibly* be read as supporting an inference of suicide. An abundance of evidence however, ignored by the referee, was offered which supports the contrary inference.

Decedent was described by his co-workers as a jovial, happy-go-lucky man, although he could be quiet at times depending on the company. *E.g.* N.T. March 15, 1977, testimony of Raymond Chimarys at 37, and testimony of Charles Palulis at 73. His physician of eight years described decedent's mental attitude as happy and outgoing, N.T. February 23, 1976, testimony of Dr. Weisel at 22. Despite treatment for various ailments, including treatment for vertigo (and symptoms of loss of balance, blackouts and dizzy spells), Dr. Weisel stated that at no time had he noticed any signs of depression. N.T. February 23, 1976 at 22. While decedent's physical condition showed some signs of deterioration, his ailments were neither life-threatening nor did they prevent him from working. N.T. December 3, 1976, testimony of Dr. Weisel on recall.[3] When recalled by the employer after claimant had rested his case, Dr. Weisel

---

2. John Nimeh testified that decedent had been unusually quiet on June 22, 1975 and for a couple of preceding months. However, this witness had, shortly after the tragedy, given an inconsistent statement—that decedent was acting "O.K." on June 22, 1975—to a union official investigating the incident. N.T. March 15, 1977, testimony of Frank Drajic at 9–10, 22.

3. These illnesses and problems also included hypertension, gastro-intestinal disturbances, shortness of breath, swelling of the legs, nephritis, obesity and otitis of the ear.

further testified that decedent was not moody, was in fact "buoyant", and was not suicidal. N.T. December 3, 1976 at 11, 18, 19, 23.

Similarly, the external manifestations of decedent's mental attitude did not reveal a man about to end his life. He had recently (in June) paid a contractor to do some remodeling to the home he shared with the claimant. N.T. February 23, 1976, Joseph Garcia, Jr. at 28–29. Decedent had been looking forward to a week-long visit around the fourth of July by his son, daughter-in-law and grandchildren. N.T. February 23, 1976 at 26–27. On the day of his death, he had joked with co-employees, had gotten a newspaper from one of them and had been asking, just five minutes before his fall, where he could get some cold sodas. N.T. March 15, 1977, Frank Drajic at 13, Raymond Chimarys at 33–36, Charles Palulis at 51–52, 73.

I do not suggest that it is impossible to rebut the presumption of suicide in the absence of evidence tending to show a state of mind prone to commit such an act.[4] However, given the strength of the presumption, the circumstan-

---

4. In the referee's narration, he discusses the lay coroner's death certificate which stated under the heading of "other significant conditions" contributing to death, "voluntary leap from building." However, it is clear that this statement can be given *no* credence for the following reasons. First, the referee gave it no credence. *See* Fact Finding # 10. Second, this statement seems to have been based solely on the deputy coroner's discussion with two of the company investigators, not on independent investigation. N.T. October 4, 1976, John Shupp, deputy coroner. Third, the coroner's credibility is *nil*, as seen by his trial testimony. The coroner, Joseph Reichel (the local funeral director) claimed that he talked to Dr. Weisel by phone and that Dr. Weisel had informed him that decedent had been depressed and was being treated for alcoholism. N.T. February 3, 1977 at 7–15. To support this claim, the coroner produced a photostatic copy of his long-distance telephone records showing two calls to different numbers in the doctor's town. Dr. Weisel denied talking with the coroner or informing him that decedent was alcoholic or moody and depressed. N.T. December 3, 1976 at 14–18. Moreover, the phone company records were subsequently introduced *by claimant's counsel* who demonstrated, with stipulation by Bethlehem's attorney, that neither of the numbers indicated on said records were the telephone number of Dr. Weisel. From the foregoing it is plain that the coroner's statement on the certificate ("voluntary leap") is entitled to *no* weight at all, and the referee properly ignored it.

tial evidence would have to be so clear, positive and compelling as to render the possibility of accidental death highly unlikely. *Ford v. A.E. Dick Co., supra.* Such is decidedly not the case here.

It would be accurate and fair to say that *the sole factual predicate upon which the theory of suicide in this case was based is a mysterious set of footprints that could have been made by anyone at the Bethlehem plant.* A team of investigators made up of company supervisory personnel examined the numerous potential sites from which decedent could have fallen.[5]

At trial, the safety supervisor gave testimony that the team had rejected most of the possibilities for various reasons, but in most instances scant factual evidence was given to support these deductions. One of the possible exit points, the "cold screen scinter building", decedent's working station where he had been working alone earlier that day, was rejected by the investigating committee because there were no dust disturbances on the window sills. Memorandum of Investigating Committee dated June 30, 1975, conclusion # 3, admitted at the hearing of August 13, 1976. The scinter room is located in between and on a line with the gas pipe lines and the window of the "small bag house."

The "small bag house" became the focal point of the investigation because a single set of footprints was seen leading up the stairs, into the room and up to the window, but *not* leading back out of the room or down the stairs. Because of the physical characteristics of the window and surrounding area, the investigators concluded that a person falling from that window would had to have voluntarily jumped. Thus, the investigating committee concluded (and the referee accepted) that Joseph Garcia must have intentionally jumped to his death from the small bag house window. The suicide theory, however, is *without founda-*

5. Specific page references will not usually be given in text, but the testimony of the investigators appears at N.T. March 24, 1976 (David Scurry, supervisor and general foreman); N.T. August 13, 1976 and June 28, 1976 (David Foley, safety supervisor); N.T. November 29, 1976 (John Van Keuren, divisional superintendent of blast furnaces).

*tion as it is pure speculation to assume that the foot-prints were made by decedent and, moreover, the evidence contradicts such an assumption.* The record discloses the following.

First, the safety supervisor testified that footprint comparisons between the decedent's shoes and the footprints were impossible because the investigating team had "sloppied up the whole area." N.T. August 13, 1976 at 16–18, 29. However, this investigator had filed a report on June 27, 1975, stating "We had his [decedent's] safety shoes with us and the sole patterns of several of the footprints matched *but the heel pattern did not.*" N.T. August 13, 1976 (report admitted as exhibit).

Second, co-worker Charles Palulis testified that on the Thursday preceding the Sunday, June 22 incident, he had entered the small bag house to perform some of his job duties. If only one set of footprints existed in the small bag house, however, it would be as reasonable to assume they were made by Mr. Paululis as by anyone else. N.T. March 15, 1977 at 49, 59. The small bag room was also described as dusty. It is certainly possible that there were no exiting set of footprints because the exiting set had been covered by dust. (There was no testimony that dust on the floor of the small bag room was evenly distributed throughout the room, or as to the rate of dust accumulation.) Thus, the footprints leading in, but not out, of the small bag room *may* support an inference of a voluntary leap from the building *but cannot of itself rebut the presumption against suicide.*

There was also testimony by co-employee Raymond Chimarys that five minutes before the accident decedent had spoken to him in a room 4 or 5 flights of steps below the small bag room, that decedent would had to have walked past him to get to the stairwell leading to the small bag room (unless he took a circuitous route down stairs, up an elevator to one floor above Mr. Chimarys and then up the stairwell), and that he did not see decedent use the stairwell. Additionally, according to Mr. Chimarys and others,

decedent was pale and short of breath, a condition which was consistent with decedent's medical history of vertigo, loss of balance and black-outs.

Finally, it is noteworthy that the investigating committee's official report of June 30, 1975 stated: "the Committee agreed on the following: . . . 4. Garcia *fell or jumped* from the top window on the south side of the Cold Screen Building . . . ." While a Bethlehem division supervisor attempted to explain the earlier conclusion that decedent "fell or jumped," [6] the June 30th report nevertheless buttresses the inference of accident and further undercuts the flimsy case for an inference of suicide.

As we have stated in the context of criminal prosecutions, wholly circumstantial evidence may sustain a criminal conviction but the conviction may not be based upon mere surmise or conjecture. *Commonwealth v. Thomas,* 465 Pa. 442, 350 A.2d 847, 849 (1976). "When two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or liberty." *Commonwealth v. New,* 354 Pa. 188, 221, 47 A.2d 450, 468 (1946). Although the consequences of "guessing" in a workmen's compensation case are different from those in a criminal prosecution, the consequences are nonetheless serious, particularly because of the stigma by society attached to one who intentionally takes his own life and the pain felt by the family of a decedent who stands so accused.

I would therefore hold that the referee's finding that decedent voluntarily jumped from the small bag room window is without sufficient competent evidence to justify the conclusion that Joseph Garcia's death was intentionally self-inflicted. The employer's paltry "evidence" regarding the mysterious footprints does not remotely approach the clear, positive and convincing evidence we require of an

---

**6.** The explanation was that in deference to decedent's family, the committee used the words "fell or" to ameliorate possible repurcussions with the family.

employer to meet his statutory burden of proof and to rebut the strong presumption against suicide.

As to the referee's finding of claimant's partial dependency, which was upheld by the Board, I would find sufficient competent evidence to justify same. While decedent paid most of claimant's living and travel expenses, it was established that decedent did not pay all of them. Claimant had an income of $200 per month and paid for some of his food and expenses from that income. Also, decedent had not claimed his father as a dependent on his 1973 and 1974 income tax forms. While I might have reached another conclusion from other evidence, I cannot say there was insufficient competent evidence to support the referee's finding of partial dependency.

Accordingly, I would reverse the order of the Commonwealth Court, reinstate the order and award of the Workmen's Compensation Appeal Board, and remand to the Board for computation of interest and award currently due.

ROBERTS, C.J., and ZAPPALA, J., join this dissenting opinion.